# IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| PETER BRINCKERHOFF, INDIVIDUALLY AND AS TRUSTEE OF THE PETER R. BRINCKERHOFF REV. TR U A DTD 10/17/97, and on behalf of all others similarly situated, | § § § § § § | No. 273, 2016 |
| Plaintiff Below, Appellant, | § § § | Court Below—Court of Chancery of the State of Delaware |
| v. | § § | C.A. No. 11314 |
| ENBRIDGE ENERGY COMPANY, INC., et al., | § § § § | |
| Defendants Below, Appellees, | § § | |
| and | § § | |
| ENBRIDGE ENERGY PARTNERS, L.P., | § § § § | |
| Nominal Defendant Below, Appellee. | § § | |

Submitted: January 11, 2017
Decided: March 20, 2017

Before **STRINE**, Chief Justice; **HOLLAND**, **VALIHURA**, **VAUGHN**, and **SEITZ**, Justices, constituting the Court *en Banc*.

Upon appeal from the Court of Chancery: **REVERSED**

Jessica Zeldin, Esquire, Rosenthal, Monhait & Goddess, P.A., Wilmington, Delaware; Lawrence P. Eagel, Esquire (*argued*), Jeffrey H. Squire, Esquire and David J. Stone, Esquire, Bragar Eagel & Squire, P.C., New York, New York, for Plaintiff, Appellant, Peter Brinckerhoff.

Raymond J. DiCamillo, Esquire, Richards, Layton & Finger, P.A., Wilmington, Delaware; Michael H. Steinberg, Esquire (*argued*), Sullivan & Cromwell LLP, Los Angeles, California; Laura Kabler Oswell, Esquire, Sullivan & Cromwell LLP, Palo Alto, California, for Defendants, Appellees, Enbridge Inc., J. Richard Bird, J. Herbert England, C. Gregory Harper, D. Guy Jarvis, Mark A. Maki, John K. Whelen and Enbridge Pipelines (Alberta Clipper) L.L.C.

Thomas W. Briggs, Jr., Esquire and Richard Li, Esquire, Morris, Nichols, Arsht & Tunnell LLP, Wilmington, Delaware; Kevin C. Logue, Esquire (*argued*) and Kevin P. Broughel, Esquire, Paul Hastings LLP, New York, New York, for Defendants, Appellees, Enbridge Energy Company, Inc., Enbridge Energy Management, L.L.C., Jeffrey A. Connelly, Rebecca B. Roberts, Dan A. Westbrook, Enbridge Energy Limited Partnership and Nominal Defendant Enbridge Energy Partners, L.P.

**SEITZ**, Justice:

The plaintiffs, Peter Brinckerhoff and his trust, are long-term investors in Enbridge Energy Partners, L.P. ("EEP"), a Delaware master limited partnership ("MLP"). As followers of this investment space know, MLPs are set up in the petroleum transportation business to allow sponsors and public investors to take advantage of favorable tax laws. Another benefit under Delaware law is the ability to eliminate common law duties in favor of contractual ones, thereby restricting disputes to the four corners of the limited partnership agreement ("LPA").

MLPs are typically families of entities that often engage in internal business transactions, referred to as dropdowns, rollups, insider financings, incentive distribution rights, and equity investments. Because the entities proposing transactions often have representatives seated at both sides of the negotiating table, the LPAs typically attempt to address conflicts using various contractual tools. Even so, disputes still arise over whether the conflicted parties have complied with the letter and spirit of the LPA. Our Court has frequently been called upon to interpret a number of LPAs to resolve these disputes.[1]

---

[1] *E.g., Dieckman v. Regency GP LP*, __ A.3d __, 2017 WL 243361, (Del. Jan. 20, 2017); *El Paso Pipeline GP Co., L.L.C. v. Brinckerhoff*, __ A.3d __, 2016 WL 7380418, (Del. Dec. 20, 2016); *Employees Ret. Sys. of the City of St. Louis v. TC Pipelines GP, Inc.*, 2016 WL 7338592 (Del. Dec. 19, 2016) (TABLE); *Haynes Family Trust v. Kinder Morgan G.P., Inc.*, 2016 WL 912184 (Del. March 10, 2016) (TABLE); *Allen v. El Paso Pipeline GP Co., L.L.C.*, 2015 WL 803053 (Del. Feb. 26, 2015) (TABLE); *Allen v. Encore Energy Partners, L.P.*, 72 A.3d 93 (Del. 2013); *Gerber v. Enter. Prods. Holdings, LLC*, 67 A.3d 400 (Del. 2013) *overruled on other grounds by Winshall v. Viacom Intern., Inc.*, 76 A.3d 808 (Del. 2013); *Norton v. K-Sea Transp. Partners L.P.*, 67 A.3d 354 (Del. 2013); *Brinckerhoff v. Enbridge Energy Co.*, 67 A.3d 369 (Del. 2013).

This is not the first lawsuit between Brinckerhoff and the Enbridge MLP entities over a conflicted transaction. In 2009, Brinckerhoff filed suit against most of the same defendants in the current dispute, and challenged a transaction between the sponsor and the limited partnership. Enbridge, Inc. ("Enbridge"), the ultimate parent entity that controlled EEP's general partner, Enbridge Energy Company, Inc. ("EEP GP"), proposed a joint venture agreement ("JVA") between EEP and Enbridge, whereby Enbridge would contribute 66.7% and EEP would contribute 33.3% of the cost, and share the profits in the same proportion, of the Alberta Clipper project—a proposed pipeline used to transport petroleum from the Alberta tar sands to the United States.

Brinckerhoff contested the fairness of the transaction on a number of grounds. After several rounds in the Court of Chancery leading to the dismissal of his claims, and a trip to our Court, Brinckerhoff eventually came up short when we affirmed the Court of Chancery's ruling that he had waived his claims for reformation and rescission of the transaction by failing to assert them first in the Court of Chancery.[2]

---

[2] *Brinckerhoff v. Enbridge Energy Co., Inc.* ("*Brinckerhoff I*"), 2011 WL 4599654 (Del. Ch. Sept. 30, 2011); *Brinckerhoff v. Enbridge Energy Co., Inc.*, No. 574, 2011 (Del. March 27, 2012) (Remand Order); *Brinckerhoff v. Enbridge Energy Co., Inc.* ("*Brinckerhoff II*"), 2012 WL 1931242 (Del. Ch. May 25, 2012); *Brinckerhoff v. Enbridge Energy Co., Inc.* ("*Brinckerhoff III*"), 67 A.3d 369 (Del. 2013).

The Alberta Clipper project would blow east again into the Court of Chancery. In 2014, Enbridge proposed that EEP repurchase Enbridge's interest in the Alberta Clipper project ("Alberta Clipper Interest"), excluding the expansion rights that were part of the earlier transaction. As part of the billion dollar transaction, EEP would issue to Enbridge $694 million of a new class of EEP partnership securities designated Class E Units, repay $306 million in outstanding loans made by EEP GP to EEP, and, central to the current dispute, amend the LPA to effect a "Special Tax Allocation" whereby the public investors would be allocated items of gross income that would otherwise be allocated to EEP GP.

The allocation of gross income for tax purposes has important consequences to the public investors. According to Brinckerhoff, the Special Tax Allocation unfairly benefited Enbridge by reducing its tax obligations by hundreds of millions of dollars while increasing the taxes of the public investors, thereby undermining the investor's long-term tax advantages in their MLP investment.

Brinckerhoff filed suit and alleged that the defendants breached the LPA by (a) agreeing to repurchase the same asset—the Alberta Clipper Interest—EEP sold to Enbridge six years earlier, on terms Brinckerhoff claims were not "fair and reasonable" as required by Section 6.6(e) of the LPA; and (b) implementing the Special Tax Allocation that, according to Brinckerhoff, materially adversely

3

affected the investors, and enlarged their "obligations," in violation of Sections 5.2(c) and 15.3(b) of the LPA.

EEP GP and its Affiliates moved to dismiss, claiming that, regardless of any breach of the LPA's specific affirmative requirements, before Brinckerhoff could pursue his claims, he first had to plead facts leading to an inference that the defendants acted in bad faith. In other words, EEP GP and its affiliates were free to breach *any* of the LPA's specific requirements, so long as they did so in good faith. The defendants also argued that to allege bad faith, Brinckerhoff had to plead facts that ruled out all legitimate explanations for the defendants' actions except for bad faith—a pleading hurdle borrowed from one of the most demanding corporate law standards, that of "waste."

The Court of Chancery did its best to reconcile earlier decisions interpreting the same or a similar LPA, and ended up dismissing the complaint. Though the court believed that in the corporate context Brinckerhoff's allegations would have stated a claim, it concluded that so long as EEP GP acted in good faith, it was free to breach any of the LPA's specific requirements. Once that standard applied, the court found that Brinckerhoff had failed to allege bad faith conduct by EEP GP, which required dismissal of the complaint.

On appeal, Brinckerhoff has challenged the reasonableness of the Court of Chancery's interpretation of the LPA. He also argues that this Court in

4

*Brinckerhoff III* improperly defined what was needed to plead bad faith. As Brinckerhoff sees it, his allegations that (a) the partnership agreed to pay $200 million more to Enbridge to repurchase the same asset it sold in 2009, despite declining EBITDA, slumping oil prices, and the absence of expansion rights sold in 2009; (b) EEP's financial advisor ignored the 2009 transaction as a comparable transaction; (c) EEP GP added hundreds of millions of dollars more in benefits for itself and Enbridge through the Special Tax Allocation, to the detriment of the public unitholders and in breach of specific provisions of the LPA; and (d) the Special Tax Allocation was not properly valued when determining whether the transaction's terms were fair and reasonable to the Partnership—support a fair pleading-stage inference of bad faith that precludes dismissal.

We agree with Brinckerhoff in part and reverse the decision of the Court of Chancery. We say in part because we agree with the defendants that the Special Tax Allocation did not breach Sections 5.2(c) and 15.3(b) governing new unit issuance and tax allocations. But, we find that the Court of Chancery erred when it held that other "good faith" provisions of the LPA "modified" Section 6.6(e)'s specific requirement that the Alberta Clipper transaction be "fair and reasonable to the Partnership." The provisions of the LPA relied on by the Court of Chancery— Sections 6.8(a), 6.9(a), and 6.10(d)—exculpate EEP GP and others from monetary damages if they act in good faith, apply a good faith standard to EEP GP's

5

resolution of conflicts of interest, and replace default fiduciary duties with a contractual good faith standard. They do not, however, alter the specific affirmative obligations of the LPA. The Court of Chancery's interpretation of the LPA leads to an unreasonable result no public investor would have considered possible when reviewing the LPA—that EEP GP is free to violate any specific LPA requirement so long as the breach is in good faith. In fact, precisely because the Delaware Revised Uniform Limited Partnership Act ("DRULPA") allows LPAs—like that of the Enbridge LPA—to eliminate fiduciary duties, it is essential that unitholders be able to hold the GP accountable for not complying with the terms of the LPA.

We also find that the Court of Chancery erred when it determined that EEP GP and its Affiliates were exculpated under Section 6.8(a) from any liability for breaching the LPA. The Court of Chancery cannot be faulted for faithfully applying our earlier decision in *Brinckerhoff III*, and its rigorous pleading standard for bad faith. But we now change course from our earlier decision and adhere to the more traditional definition of bad faith utilized in Delaware entity law. We hold that bad faith is sufficiently alleged under the Enbridge LPA if the plaintiff pleads facts supporting an inference that EEP GP did not reasonably believe it was acting in the best interest of the partnership. Accepting the facts as pled, as we must on an appeal from a motion to dismiss, Brinckerhoff has met this standard.

6

On remand, Brinckerhoff can proceed on his claim that the Alberta Clipper transaction violated Section 6.6(e). If the Court of Chancery eventually finds a breach of Section 6.6(e), and the defendants as Indemnitees are not immune from monetary damages under Section 6.8(a) because they acted in bad faith, the court can assess monetary damages to remedy the breach. Alternatively, if the defendants are immune from monetary damages under Section 6.8(a) because they acted in good faith, or the court finds that monetary damages would be speculative or difficult to determine reliably, then we leave it to the Court of Chancery's broad discretion, after its evaluation of all of the circumstances of the case, whether to impose an equitable remedy tailored to address the harm caused by the breach of Section 6.6(e) of the LPA.

## I.

Peter Brinckerhoff is a unitholder of 73,080 Class A EEP common units. The defendants and their business relationships are as follows:

> EEP - A publicly-traded Delaware MLP headquartered in Houston, Texas. EEP's business focuses on energy transportation in the mid-Continent and Gulf Coast regions of the United States. EEP was formed in 1991 to own and operate the Lakehead pipeline system, the United States portion of a crude oil and liquid petroleum pipeline system running through portions of Canada and the United States.
>
> EEP GP - The general partner of EEP. EEP GP is a Delaware corporation wholly owned by Enbridge, Inc. EEP GP owns a 2% general partnership interest and 38.1% limited partnership interest in EEP. EEP GP also owns 100% of the voting shares and 11.7% of the listed shares of Enbridge Energy Management, L.L.C.

Enbridge Energy Management, L.L.C. ("Enbridge Management") - EEP's designated manager. Enbridge Management owns a 14.7% limited partnership interest in EEP.

Enbridge - EEP GP's controlling parent. Enbridge is a Canadian energy corporation operating an integrated midstream asset network in Canada and the United States. Enbridge indirectly owns 100% of EEP GP. Through its control of EEP GP and Enbridge Management, Enbridge controls a 2% general partnership interest and a 52.8% limited partnership interest in EEP.

The following chart from the Court of Chancery's opinion depicts the relationships between the entities.



The remaining defendants, Jeffrey A. Connelly, Rebecca B. Roberts, Dan A. Westbrook, J. Richard Bird, J. Herbert England, C. Gregory Harper, D. Guy Jarvis,

Mark A. Maki, and John K. Whelen (the "Director Defendants") each served as directors, and in some cases, officers of EEP GP and Enbridge Management. Defendants Roberts and England also served as Enbridge directors, and Bird, Harper, Jarvis, Maki, and Whelen served as Enbridge officers.

## A.

In early 2009, EEP owned 100% of the Alberta Clipper project, a proposed $1.2 billion pipeline construction project extending almost a thousand miles from Hardisty, Alberta to Superior, Wisconsin.[3] EEP wanted to build the pipeline to meet the expected petroleum demands in the Midwestern United States. In April 2009, Enbridge proposed a joint venture to EEP whereby Enbridge would contribute 75% and EEP would contribute 25% of the Alberta Clipper project's costs. Profits would be divided according to their percentage contributions. The transaction also included expansion rights.[4]

EEP GP formed a Special Committee to determine whether the Alberta Clipper project transaction was "fair and reasonable to [EEP] and its unitholders,"[5] and to make a recommendation whether to pursue the transaction. The Special

---

[3] The Alberta Clipper project was operated through another operating limited partnership, OLP. EEP's and EEP GP's interests in the Alberta Clipper project were held through their percentage interest in OLP. The OLP entity is immaterial to the dispute. App. to Opening Br. at 329, n. 7 (Answering Br. in Opposition to Mot. to Dismiss), 25-29 (Compl. ¶¶ 18-25), 34-35 (Compl. ¶¶ 38-39).

[4] When complete, the expansion projects would increase the Alberta Clipper pipeline's U.S. throughput capacity from 450,000 to 800,000 bpd, a 78% increase in capacity. *Id*. at 21 (Compl. ¶ 7).

[5] *Brinckerhoff I*, 2011 WL 4599654, at *2.

Committee hired a financial advisor who was asked to evaluate whether the Alberta Clipper transaction "was representative of an arm's length transaction."[6]

In response to Enbridge's proposal, the Special Committee recommended that EEP retain a 33.3% equity stake in the Alberta Clipper project. EEP agreed to the revised split. The financial advisor then opined that the JVA's terms "are representative, in all material respects, of those that would have been obtained by the Partnership in an arm's length transaction."[7] The Special Committee thereafter recommended the transaction to EEP GP's board. When the transaction closed in 2009, the 66.7% Alberta Clipper Interest was valued at $800 million, a multiple of 7x EBITDA. Brinckerhoff alleged that the Special Committee's financial advisor typically recommended a 9-12x forward year EBITDA multiple.

Brinckerhoff filed a complaint in the Court of Chancery asserting derivative and direct claims against most of the same defendants named in the current action. Relying on multiple legal theories, Brinckerhoff essentially claimed that EEP GP and others sold the Alberta Clipper Interest to Enbridge for an unreasonably low price.

In *Brinckerhoff I*, the Court of Chancery recognized that the Enbridge LPA contained a specific provision, Section 6.6(e), covering the JVA. Section 6.6(e) required that the JVA be "fair and reasonable to the Partnership." But the court

---

[6] *Id.*
[7] *Id.* at *3.

10

jumped to another LPA provision, Section 6.8(a), which exculpates Indemnitees, including EEP GP, from monetary damages if the Indemnitee acted in good faith. Invoking the conclusive presumption of good faith in Section 6.10(b) when EEP GP relies on a qualified advisor, the Court of Chancery found that EEP GP was exculpated from monetary damages. The other defendants were also found to have acted in good faith. The court dismissed the complaint without considering the possibility of equitable relief to remedy a breach of Section 6.6(e).

Brinckerhoff appealed the dismissal. Before considering the merits of the appeal, our Court remanded to the Court of Chancery to consider "the sufficiency of [Brinckerhoff's] claims for reformation and rescission under Chancery Court Rule 12(b)(6) in the first instance."[8] Following remand, the court issued its decision in *Brinckerhoff II*, finding that equitable relief could be a viable remedy for breach of the LPA, but also ruling that Brinckerhoff waived his right to seek any equitable relief.

In *Brinckerhoff III*, we affirmed the Court of Chancery's decisions in *Brinckerhoff I* and *II*. Specifically, we affirmed both the finding of waiver, and absence of bad faith. Using corporate law principles similar to pleading waste, we found that Brinckerhoff had failed to allege that "the decision to enter into the JVA, under the circumstances, must be 'so far beyond the bounds of reasonable

---

[8] *Brinckerhoff v. Enbridge Energy Co., Inc.*, No. 574, 2011 (March 27, 2012) (Remand Order).

11

judgment that it seems essentially inexplicable on any ground other than bad faith.'"[9]

B.

Turning to the current dispute, Brinckerhoff claims that, during the five years before the announcement of the next Alberta Clipper transaction, crude oil prices declined, reflected in the Alberta Clipper project's nearly 20% decrease in projected EBITDA. Further, tariffs on the Alberta Clipper project faced increased risk that they would be rebased with long-term negative effect on revenue. Despite this negative environment, on September 16, 2014, Enbridge proposed a sale of its Alberta Clipper Interest, excluding the earlier expansion rights, to EEP for $1 billion, a multiple of 10.7x EBITDA. The purchase price consisted of $694 million in newly issued Class E units and approximately $306 million in repaid debt. As part of the transaction, the LPA would be amended to "allocate to the Public Unitholders significant items of gross income that [would otherwise] have been allocated to [General Partner]," referred to as the Special Tax Allocation.[10]

According to Brinckerhoff, the Special Tax Allocation benefited Enbridge in two ways. First, it would offset a $410 million capital gain EEP GP expected to

---

[9] *Brinckerhoff III*, 67 A.3d at 373 (quoting *Parnes v. Bally Entm't Corp.*, 722 A.2d 1243, 1246 (Del. 1999)).

[10] App. to Opening Br. at 19 (Compl. ¶ 2).

incur on the sale of its Alberta Clipper Interest back to EEP.[11] Second, EEP GP would receive fewer cash distributions from EEP on the Class E Units than EEP GP would have received from the Alberta Clipper Interest. Brinckerhoff claims the Special Tax Allocation depressed EEP GP's allocation of Partnership income by an additional amount to lower EEP GP's tax burden.

The bottom line, according to Brinckerhoff, is EEP GP's unfair shift of a large tax burden from EEP GP to the public unitholders. Brinckerhoff alleges that the Special Tax Allocation amounts to approximately "$24.8 million of additional gross income, per year, for 22 years (or approximately $545.6 million in total), and then approximately $12.4 million per year thereafter in perpetuity."[12] According to the complaint, "the Special Tax Allocation increases the proportion of Partnership income taxes for which Class A and B common unit holders and Class D unit holders are responsible, without the benefit of receiving distributions in that proportion."[13]

---

[11] According to Brinckerhoff, partnership allocations of gross income to unitholders are simply book entries. No money changes hands. These amounts are, however, gross income immediately taxable to the unitholder. When cash is distributed to unitholders, it is considered a return of capital and is not immediately taxable. But the cash distributions lower the cost basis for each unit (as other factors impact basis such as deductions and taxable partnership income). As "estate" assets, many unitholders invest in MLP units with an eye towards a stepped-up basis at death, wiping out the built-up taxable gain in the units. *Id.* at 690-91 (Basic Tax Principles for MLP Investors Pamphlet).

[12] *Id.* (Compl. ¶ 2).

[13] *Brinckerhoff v. Enbridge Energy Co., Inc.* ("*Brinckerhoff IV*"), 2016 WL 1757283, at *4, n. 26 (Del. Ch. Apr. 29, 2016).

In response to Enbridge's proposal, Enbridge Management, as designated manager for EEP GP, formed a Special Committee consisting of Roberts, Connelly, and Westbrook. The Special Committee's charge was to determine whether the offer was fair and reasonable to EEP and its unitholders (other than EEP GP and its affiliates), and whether they should proceed with the transaction or seek alternatives.[14] The Special Committee hired legal counsel and an investment banker, Simmons & Company International ("Simmons").

During a presentation on December 23, 2014, Simmons explained to the Special Committee that, "[a]t the updated proposed transaction value of $1 billion, [EEP GP] is projected to have a large taxable gain of $410 million on the sale of its units in Alberta Clipper."[15] Thus, "to be cash neutral, the taxable gain will be allocated to the EEP A, B, and D [unitholders]."[16] Enbridge planned to partially offset the increased tax burden by allocating additional "depreciation to the A, B, and D units."[17] Simmons informed the Special Committee that the Special Tax Allocation would "negate most of the accretion the Public Unitholders would otherwise obtain from the Transaction."[18] On December 23, 2014, Simmons concluded that "the Transaction is fair to [EEP] and to the holders of EEP's

---

[14] App. to Opening Br. at 83 (Simmons Presentation).
[15] *Id.* at 113.
[16] *Id.*
[17] *Id.*
[18] *Id.* at 41 (Compl. ¶ 59). According to Brinckerhoff, although the Special Committee knew that the Special Tax Allocation represented additional consideration paid to EEP GP for the Alberta Clipper Interest, it never learned how much that consideration was worth.

common units (other than [EEP GP] and its affiliates) from a financial point of view."[19] The Special Committee then recommended the transaction, and EEP GP approved the transaction the same day.[20]

On January 2, 2015, EEP repurchased from Enbridge the Alberta Clipper Interest, excluding the Alberta Clipper project expansion rights, for $1 billion. On the same day, EEP GP amended the 6th LPA to create the 7th LPA, adding Section 5.2(i) to implement the Special Tax Allocation.

## C.

On July 20, 2015, Brinckerhoff filed an eight-count complaint in the Court of Chancery against the defendants. In essence, the complaint claims that the defendants violated three specific provisions of the LPA by approving the Alberta Clipper transaction—Section 6.6(e), requiring that contracts with Affiliates be "fair and reasonable to the Partnership"; Section 5.2(c), governing new unit issuance; and Section 15.3(b), prohibiting enlargement of the unitholders' "obligations" under the LPA. Brinckerhoff sought monetary damages against all defendants, and equitable relief rescinding the Alberta Clipper transaction or reforming the transaction "to render the Transaction fair and reasonable to EEP and the Public

---

[19] *Id*. at 307 (Simmons Fairness Opinion).
[20] Enbridge announced in a press release the same day that EEP agreed to purchase the Alberta Clipper Interest. The press release stated that the Class E units would be entitled to the same distributions as Class A common units held by the public. It did not mention the Special Tax Allocation. *See* App. to Opening Br. at 75-76 (Press Release).

Unitholders" and to remove the newly-added Section 5.2(i) implementing the Special Tax Allocation.[21]

Following briefing on the defendants' motion to dismiss, the Court of Chancery granted the motion. Relying on the trilogy of earlier *Brinckerhoff* decisions and other MLP cases, the court set aside the LPA's specific requirements and focused instead on the LPA's good faith standards. According to the court, "Brinckerhoff was obliged to state well-pled facts that would allow a reasonable inference that Defendants acted in bad faith" before considering his LPA breach claims.[22] Because he had failed to do so under the rigorous pleading standard adopted in *Brinckerhoff III*, the court ruled that the defendants were exculpated from any liability under the LPA, and dismissed the complaint.[23] This appeal followed.

## II.

We turn to the gating issue on appeal—whether the Court of Chancery correctly found that the LPA can reasonably be interpreted to permit EEP GP to breach any of the LPA's specific requirements if EEP GP acts in good faith.

---

[21] *Id*. at 73 (Compl.).
[22] *Brinckerhoff IV*, 2016 WL 1757283, at *20.
[23] The Court of Chancery wondered about the impact of its ruling excusing compliance with the specific provisions of the LPA if EEP GP acted in good faith: "In response to this conclusion, one might reasonably ask whether EEP GP, as a practical matter, is relieved of all obligations to act in compliance with the detailed provisions of a limited partnership agreement that comprehensively address[es] nearly all aspects of the relationship between the general and limited partners." *Id*. at *18, n. 125.

16

Because the appeal is from a decision granting a motion to dismiss, we review the claims of error *de novo*.[24]

The Court of Chancery did its best to attempt to reconcile complex contractual provisions and confusing precedent. In this appeal, we change course from the earlier pleading standard announced in *Brinckerhoff III* to which the Court of Chancery was bound, and apply the definition of bad faith that is commonly used in our entity law and incorporated into the Enbridge LPA. We also hold that the LPA's general good faith standards do not displace specific affirmative obligations contained in other provisions of the LPA.

### A.

The DRULPA permits the LPA drafter to disclaim fiduciary duties, and replace them with contractual duties.[25] The drafter cannot, however, disclaim the implied covenant of good faith and fair dealing.[26] If fiduciary duties have been validly disclaimed, the limited partners cannot rely on traditional fiduciary principles to regulate the general partner's conduct. Instead, they must look exclusively to the LPA's complex provisions to understand their rights and

---

[24] *Cent. Mortg. Co. v. Morgan Stanley*, 27 A.3d 531, 535 (Del. 2011) (citing *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896 (Del. 2002)).
[25] 6 *Del. C.* § 17-1101(d).
[26] *Id.*

remedies.[27] Further, when trying to square existing precedent with the language of

different LPAs, we have observed that:

> Although the limited partnership agreements in all of these cases
> contain troublesome language, each decision was based upon
> significant nuanced substantive differences among each of the specific
> limited partnership agreements at issue. That is not surprising,
> because the Delaware Revised Uniform Limited Partnership Act is
> intended to give "maximum effect to the principle of freedom of
> contract." Accordingly, our analysis here must focus on, and examine,
> the precise language of the LPA that is at issue in this case.[28]

Turning to the provisions of the Enbridge LPA, Section 6.10(d) of the LPA

modifies, waives or limits common law duties in favor of contractual duties:

> Any standard of care and duty imposed by this Agreement or under
> the Delaware Act of any applicable law, rule or regulation shall be
> modified, waived or limited as required to permit the General Partner
> to act under this Agreement or any other agreement contemplated by
> this Agreement and to make any decision pursuant to the authority
> prescribed in this Agreement, so long as such action is reasonably
> believed by the General Partner to be in the best interests of the
> Partnership.[29]

In *Norton v. K-Sea Transp. Partners, L.P.*, we interpreted language nearly

identical to Section 6.10(d), and held that it unconditionally eliminated all common

law standards of care and fiduciary duties, and substituted a contractual good faith

standard of care—that the General Partner "reasonably believe that its action is in

---

[27] *Gotham Partners, L.P.*, 817 A.2d at 170.

[28] *DV Realty Advisors LLC v. Policemen's Annuity and Benefit Fund of Chicago*, 75 A.3d 101, 106-07 (Del. 2013) (citations and footnotes omitted); *see also El Paso Pipeline GP Co., L.L.C.*, 2016 WL 7380418, at *6 ("[T]he prevalence of entity-specific provisions in an area of law defined by expansive contractual freedom requires a nuanced analysis and renders deriving 'general principles' a cautious enterprise.").

[29] App. to Opening Br. at 280.

the best interest of, or not inconsistent with, the best interests of the Partnership."[30]

Although the accuracy of this interpretation is the subject of legitimate debate,[31] we choose in this case not to upset *Norton*'s settled interpretation of Section 6.10(d). Thus, we will not reinterpret Section 6.10(d), and instead will replace any standard of care and duty "imposed by this Agreement or under the Delaware Act or any applicable law, rule or regulation" with a contractual good faith standard.[32]

Article VI of the LPA addresses management and operation of the Partnership's business. Section 6.3(a), entitled "Restrictions on General Partner's Authority," provides that "[t]he General Partner may not, without written approval of the specific act by all of the Limited Partners . . . take any action in contravention of this Agreement . . . ."[33] Thus, as a threshold matter when evaluating a proposed transaction under the LPA, the court must determine what

---

[30] 67 A.3d 354, 362 (Del. 2013).

[31] The Court of Chancery has questioned this Court's interpretation of Section 6.10(d). Instead of an unconditional waiver of extra-contractual duties, one could interpret the Section to impose "a condition precedent to the effectiveness of the provisions of the LP Agreement that purport to modify, waive, or limit standards of care or duties otherwise imposed by law." *In re Kinder Morgan, Inc. Corp. Reorganization Litig.*, 2015 WL 4975270, at *5, n. 1 (Del. Ch. Aug. 20, 2015), *aff'd sub nom. The Haynes Family Trust v. Kinder Morgan G.P., Inc.*, 135 A.3d 76, 2016 WL 912184 (Del. Mar. 10, 2016) (TABLE). This is because the language modifying, waiving, or limiting standards of review and duties is effective "so long as" the General Partner "reasonably believed" its decision was in "the best interest of the Partnership." *Id*. at *5. If the general partner failed to act in the best interest of the Partnership, a condition precedent to the modification of fiduciary duties failed to occur, and arguably common law fiduciary duties would then apply to the general partner.

[32] App. to Opening Br. at 280.

[33] *Id*. at 276.

provision controls the transaction, and whether Brinckerhoff has stated a claim that EEP GP has acted in contravention of that provision.

The Alberta Clipper transaction is a contract with an Affiliate (Enbridge) to sell property (Alberta Clipper Interest) back to the Partnership (EEP). Section 6.6, entitled "Contracts with Affiliates," and in particular Section 6.6(e), directly addresses the affirmative obligation EEP GP must satisfy for such transactions: "[n]either the General Partner nor any of its Affiliates shall sell, transfer or convey any property to, or purchase any property from, the Partnership, directly or indirectly, except pursuant to transactions that are fair and reasonable to the Partnership."[34]

Even though Section 6.6(e) imposes an affirmative obligation on EEP GP, the Court of Chancery held that Section 6.10(d)'s contractual good faith standard "modifies" Section 6.6(e), and requires Brinckerhoff to first show that EEP GP lacked good faith in approving the transaction.[35] We are at a loss to understand how it does. Section 6.6(e) imposes an affirmative obligation on EEP GP when contracting with Affiliates. Section 6.10(d), on the other hand, is a general standard of care that operates in the spaces of the LPA without express standards.

---

[34] *Id*. at 278.

[35] *Brinckerhoff IV*, 2016 WL 1757283, at *13 (quoting *Brinckerhoff I*, 2011 WL 4599654, at *4 ("To meet the standard set by . . . Section 6.10(d), Plaintiff must 'plead facts suggesting that EEP GP's Board acted in bad faith' in its determination that the Transaction was 'fair and reasonable to the Partnership.'")).

20

Although EEP GP must act in good faith under the LPA, and is not subject to fiduciary standards of care, it still must comply with the specific requirements of the LPA. The Court of Chancery confused the general standard of care under Section 6.10(d) with the LPA's more specific requirements. It also violated settled rules of contract interpretation, requiring that the court prefer specific provisions over more general ones.[36]

Similar difficulties occur with the Court of Chancery's reliance on Section 6.9(a) to engraft a bad faith standard of care onto Section 6.6(e). Section 6.9(a), which addresses ways EEP GP might resolve conflicts of interest, expressly carves out other provisions of the LPA.[37] Equally important, Section 6.9(a) is a safe harbor for conflict transactions, such as mergers, that are not controlled by other

---

[36] *Gelfman v. Weeded Investors, L.P.*, 792 A.2d 977, 990 (Del. Ch. 2001) (specific provision governing conflict of interest transactions controlled in lieu of general provision addressing non-conflicted transaction); *Sonet v. Timber Co. L.P.*, 722 A.2d 319, 325 (Del. Ch. 1998) (specific provision in LPA controlled over more general provision).

[37] App. to Opening Br. at 279 ("Unless otherwise expressly provided in this Agreement . . . ."); *Brinckerhoff v. Tex. E. Prods. Pipeline Co., LLC*, 986 A.2d 370, 388-89 (Del. Ch. 2010) ("Section 6.6(e) is an 'express standard' [under Section 6.9(b) and] the defendants were required to comply only with Section 6.6(e) and were 'not . . . subject to any other or different standard imposed by this Agreement . . . .'"); *see also Norton*, 67 A.3d at 364 (interpreting a section substantially identical to Section 6.6(e) and holding that "[t]his language creates an affirmative obligation—K-Sea GP may not engage in a transaction with the Partnership unless the transaction is 'fair and reasonable'" compared to the permissive nature of the conflict resolution provision); *In re El Paso Pipeline Partners, L.P. Deriv. Litig.*, 2014 WL 2768782, at *11 (Del. Ch. June 12, 2014) (interpreting a similar conflict resolution provision and noting that the section "has its own introductory phrase—'[u]nless otherwise expressly provided in this Agreement'— which is itself important, because for certain types of transactions that involve a conflict of interest on the part of the General Partner, the LP Agreement sets forth a separate and even more specific contractual standard.").

specific provisions of the LPA. It does not displace express standards in other provisions of the LPA.

The defendants point to the last stand-alone paragraph of Section 6.9(a), and claim that it imposes a bad faith standard on all conflict transactions.[38] But as explained previously, Section 6.9(a) is a conflict resolution procedure that EEP GP can use to resolve conflicts not addressed by other LPA provisions. The bad faith limitation in the last paragraph relates only to "the resolution, action or terms so made, taken or provided" by EEP GP to resolve a conflict transaction under Section 6.9(a). Here, the Alberta Clipper transaction is expressly governed by Section 6.6(e).

Finally, taking a cue from *Brinckerhoff I*, the Court of Chancery determined that Sections 6.8(a) (good faith exculpates Indemnitees from monetary damages) and 6.10(b) (conclusive presumption of good faith based on reliance with professional advisors) "enveloped" 6.6(e), requiring Brinckerhoff to plead that the defendants lacked good faith when they approved the Alberta Clipper transaction under Section 6.6(e). The Court of Chancery also relied on a statement in

---

[38] App. to Opening Br. at 279:

> Nothing contained in this Agreement, however, is intended to nor shall it be construed to require the General Partner to consider the interests of any Person other than the Partnership. In the absence of bad faith by the General Partner, the resolution, action or terms so made, taken or provided by the General Partner with respect to such matter shall not constitute a breach of this Agreement or any other agreement contemplated herein or a breach of any standard of care or duty imposed herein or therein under the Delaware Act or any other law, rule or regulation.

22

*Brinckerhoff I* that "the Defendants 'will not be liable to EEP or its [unitholders] for *any actions* taken in good faith.'"[39]

Section 6.8(a) exculpates EEP GP and other Indemnitees from monetary damages for actions taken in good faith. But, Section 6.8(a) does not grant EEP GP absolute immunity from suit for any actions taken in good faith. Instead, it only immunizes EEP GP and other Indemnitees from monetary damages. Equitable remedies are still available. The availability of equitable remedies no doubt motivated our Court to issue the remand order in *Brinckerhoff II*, asking the Court of Chancery to consider the availability of reformation and rescission as remedies for breach of Section 6.6(e) of the LPA.[40] And, as will be discussed later, Brinckerhoff has pled viable claims that the defendants acted in bad faith when undertaking the Alberta Clipper transaction.

Our interpretation of the Enbridge LPA—Section 6.6(e) is a specific affirmative obligation of EEP GP which is not displaced by other general provisions—is the only one consistent with the overall framework of the LPA.[41] It

---

[39] *Brinckerhoff IV*, 2016 WL 1757283, at *14 (quoting *Brinckerhoff I*, 2011 WL 4599654, at *9) (emphasis in original); *see also Brinckerhoff III*, 67 A.3d at 372-73.

[40] *Brinckerhoff v. Enbridge Energy Co., Inc.*, No. 574, 2011 (March 27, 2012) (Remand Order).

[41] *See also Norton*, 67 A.3d at 365 ("This interpretation achieves the goal of giving each LPA term an independent meaning. If Section 7.9(a) were construed to impose an affirmative obligation on K-Sea GP, it would be unclear whether Section 7.6(d)'s affirmative obligation relating to transactions between K-Sea GP and K-Sea—which addresses a specific conflict of interest and contains parallel provisions—has any independent meaning or serves any independent purpose."); *see also In re El Paso Pipeline Partners*, 2014 WL 2768782, at *11

is also consistent with settled contract interpretation principles.[42]  The defendants'

interpretation would render many of the LPA's specific requirements a nullity.[43]

The Court of Chancery erred by finding that Sections 6.8(a), 6.9(a), and

6.10(d) modified the affirmative obligation set forth in Section 6.6(e).  Section

6.6(e) and its "fair and reasonable" requirement govern the Alberta Clipper

transaction.

## III.

Brinckerhoff alleged that the Alberta Clipper transaction breached three

specific provisions of the LPA—Sections 6.6(e) (the Alberta Clipper transaction

must be "fair and reasonable" to the Partnership); 5.2(c) (tax conventions,

allocations, and amendments cannot have a "material adverse effect on the

Partners"); and 15.3(b) (LPA amendments cannot "enlarge the obligations" of any

investor without their consent).  Although the Court of Chancery did not fully

consider the viability of these claims, they were presented to the court and "in the

---

(recognizing that "the LP Agreement establishes a hierarchy of contractual standards ranging from the general to the specific and that in each case the most specific standard applies.").

[42] *DCV Holdings, Inc. v. ConAgra, Inc.*, 889 A.2d 954, 961 (Del. 2005) ("Specific language in a contract controls over general language, and where specific and general provisions conflict, the specific provision ordinarily qualifies the meaning of the general one.") (internal citations omitted).

[43] The good faith precondition would override other express provisions of the LPA.  *See, e.g.*, Section 6.3(a) (EEP GP must comply with the specific provisions of the LPA); Section 6.5 (outside activities of the General Partner, covering matters falling under the corporate opportunity doctrine); and Section 6.7 (indemnification of the General Partner and other indemnitees by the Partnership).

interest of justice and for the sake of judicial economy, we decide those issues *de novo*."[44]

## A.

Under Section 6.6(e), "[n]either the General Partner nor any of its Affiliates shall sell, transfer or convey any property to, or purchase any property from, the Partnership, directly or indirectly, except pursuant to transactions that are fair and reasonable to the Partnership."[45] The requirements of 6.6(e) are deemed satisfied, however, "as to any transaction the terms of which are no less favorable to the Partnership than those generally being provided to or available from unrelated third parties."[46] In other words, the fairness and reasonableness of the transaction can be assessed by comparing it to arms-length transactions. Further, the fairness and reasonableness "shall be considered in the context of all similar or related transactions."[47] The fair and reasonable standard is "something similar, if not equivalent to entire fairness review."[48]

We find that Brinckerhoff has pled sufficient facts leading to an inference that the Alberta Clipper transaction was not "fair and reasonable to the Partnership" because EEP repurchased assets from Enbridge "less favorable to the

---

[44] *Bank of New York Mellon v. Commerzbank Capital Funding Trust II*, 65 A.3d 539, 553 (Del. 2013) (internal citations omitted).
[45] App. to Opening Br. at 278.
[46] *Id*.
[47] *Id*. at 289.
[48] *Brinckerhoff II*, 2012 WL 1931242, at *2.

Partnership than those generally being provided to or available from unrelated third parties."[49]  According to Brinckerhoff, EEP paid $200 million more to repurchase the same assets it sold in 2009, despite declining EBITDA, slumping oil prices, and the absence of the expansion rights sold in 2009.  He also alleged that, through the Special Tax Allocation, EEP GP added hundreds of millions of dollars more in benefits for Enbridge to the detriment of the public unitholders.  These allegations are sufficient to state a claim for breach of the requirements of Section 6.6(e).

B.

The same cannot be said for Brinckerhoff's claims that the Special Tax Allocation, which involved the issuance of new Class E Units, breached Sections 5.2(c) and 15.3(b) of the LPA.  Section 5.2(c) controls allocations for tax purposes needed "[f]or the proper administration of the Partnership or for the preservation of the uniformity of the Units (or any class or classes thereof) . . . ."[50]  Such allocations cannot be made if they have "a material adverse effect" on the unitholders.[51]  Brinckerhoff conceded below that Section 5.2(c) does not apply to the Alberta Clipper transaction because the Special Tax Allocation was not for the proper administration of the partnership or to equalize the tax treatment among

---

[49] App. to Opening Br. at 278.
[50] *Id*. at 270.
[51] *Id*.

unitholders.[52]  He also conceded that the Special Tax Allocation cannot have a

material adverse effect on the partners within the meaning of Section 5.2(c).[53]

Thus, Brinckerhoff has waived the argument that EEP GP breached Section 5.2(c)

of the LPA.

Section 15.3(b) sets forth the requirements to amend the LPA.  It states that,

notwithstanding earlier provisions of Section 15 addressing when and how EEP GP

can adopt LPA amendments without unitholder approval, "no amendment to this

Agreement may (i) enlarge the obligations of any Limited Partner without such

Limited Partner's consent, which may be given or withheld in its sole discretion . .

. ."[54]  Brinckerhoff argues that the Special Tax Allocation, and its potential to

generate taxable income to the unitholders, "enlarges the obligations" of the

unitholders without their consent.  Stated differently, the Special Tax Allocation

increases their tax liability to the government without their consent.

Essential to Brinckerhoff's argument is the meaning of "obligations."

Lacking a specific definition in the LPA, we look for its use in other contexts in the

LPA to discern its meaning.[55]  We note first that "obligations" is not used

---

[52] *Id*. at 668 (Oral Argument Trans.).
[53] *Id*. at 669.
[54] *Id*. at 295.
[55] *See Kuhn Const., Inc. v. Diamond State Port Corp.*, 990 A.2d 393, 397 (Del. 2010) (looking to how term was used in other parts of a contract to assess its meaning); *Radio Corp. of Am. v. Philadelphia Storage Battery Co.*, 6 A.2d 329, 334 (Del. 1939) ("[W]ords used in one sense in one part of the contract will ordinarily be considered to have been used in the same sense in another part of the same instrument where the contrary is not indicated."); *In re Mobilactive*

anywhere in Article IX of the LPA addressing "Tax Matters." The word does, however, appear in Article VII, entitled "Rights and Obligations of Limited Partners." In that context, "obligations" plainly means the responsibilities, or more accurately, lack of responsibilities, of the limited partners *to the Partnership*. Article VII addresses the "limited" nature of the limited partners' liability under the LPA (Section 7.1); the lack of an obligation to manage the business (Section 7.2); and the lack of an obligation to work exclusively on partnership business (Section 7.3). In the context of Article XIV entitled "Dissolution and Liquidation," Section 14.8 uses the word "obligations" to eliminate any duty by the limited partners to restore negative balances in their capital account to the Partnership upon liquidation of the Partnership. And finally, "obligations" is used in Sections 5.11, 5.12, and 5.13 addressing the "rights and obligations" of unitholders.

When the word "obligations" in Section 15.3(b) is placed in the context of the LPA as a whole, we find that the only reasonable meaning of the word "obligations" in Section 15.3(b) is contractual obligations that the limited partners owe *to the Partnership*. The Special Tax Allocation might increase the limited partners' tax liability to the government, but it does not enlarge the limited partners' obligations to the Partnership. Thus, EEP GP has not breached Section

_____

*Media, LLC*, 2013 WL 297950, at *19 (Del. Ch. Jan. 25, 2013) (interpreting phrase "so as to give it the same meaning throughout the [a]greement"); 28 Richard A. Lord, *Williston on Contracts* § 32:6 ("Generally, a word used by the parties in one sense will be given the same meaning throughout the contract in the absence of countervailing reasons.").

28

15.3(b) by potentially allocating additional gross income to the limited partners through the Special Tax Allocation.

## IV.

Having established that Brinckerhoff has pled a viable claim for breach of Section 6.6(e), we turn to possible remedies. If a breach is eventually found, then under Section 6.8(a), EEP GP is exculpated from monetary damages if it acts in good faith. Equitable remedies are not exculpated. We find that Brinckerhoff has pled facts supporting an inference that EEP GP acted in bad faith in approving the Alberta Clipper transaction.

## A.

Absent contractual limitations, if EEP GP breached the LPA, and damages could be established with reasonable certainty, EEP GP would pay monetary damages to the unitholders. Section 6.8(a), however, exculpates EEP GP as an Indemnitee from monetary damages if it acted in good faith:

> Notwithstanding anything to the contrary set forth in this Agreement, no Indemnitee[56] shall be liable for monetary damages to the Partnership, the Limited Partners, the Assignees or any other Persons who have acquired interests in the Units, for losses sustained or

---

[56] App. to Opening Br. at 24:
"*Indemnitee*" means the General Partner, any Departing Partner, any Person who is or was an Affiliate of the General Partner or any Departing Partner, any Person who is or was an officer, director, employee, partner, agent or trustee of the General Partner, any Departing Partner or any such Affiliate, or any Person who is or was serving at the request of the General Partner, any Departing Partner or any such Affiliate as a director, officer, employee, partner, agent or trustee of another Person.

liabilities incurred as a result of any act or omission if such Indemnitee acted in good faith.[57]

The LPA does not define good faith. In *Brinckerhoff III*, we considered what must be pled to allege bad faith by EEP GP. Relying on *Parnes v. Bally Entertainment Corporation*, and corporate notions of waste, we held that "[t]o state a claim based on bad faith," EEP GP's decision to enter into the Joint Venture Transaction "must be 'so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any ground other than bad faith.'"[58]

On the same day we decided *Brinckerhoff III*, we also decided *Norton*, and took a different approach to define bad faith.[59] Using essentially the same language of Section 6.10(d) of the Enbridge LPA, the *Norton* LPA modified any standard of care or duty to permit the general partner to act under the LPA "so long as such action is reasonably believed by [the general partner] to be in, or not inconsistent with, the best interests of the Partnership."[60]

---

[57] *Id*. at 279.

[58] *Brinckerhoff II*, 67 A.3d 369, 372 (Del. 2013) (quoting *Parnes*, 722 A.2d at 1246 (internal quotation and citation omitted)).

[59] 67 A.3d 354 (Del. 2013).

[60] *Id*. at 361 (italics omitted). *Compare* App. to Opening Br. at 280 (any standard of care or duty modified to permit general partner to act under the LPA "so long as such action is reasonably believed by the General Partner to be in the best interests of the Partnership."). The "best interests of the partnership" are the best interests of the entity, not just the best interests of the limited partners. *See In re Kinder Morgan, Inc. Corp. Reorganization Litig.*, 2015 WL 4975270, at *8 ("[T]he members of the Committee did not have to believe that the MLP Merger was in the best interests of the limited partners. They rather had to believe in good faith that the MLP Merger was in the best interests of the Partnership."); *In re El Paso Pipeline Partners, L.P. Deriv. Litig.*, 2015 WL 1815846, at *18-19 (Del. Ch. Apr. 20, 2015) (Special Committee's

In *Norton*, we found that this expression of the standard of care [Section 7.10(d) in *Norton*, Section 6.10(d) in this case] also supplied the definition of good faith for the stand-alone good faith requirement in the exculpatory provision [Section 7.8(a) in *Norton*, Section 6.8(a) in this case]:

> [T]he LPA broadly exculpates all Indemnitees . . . so long as the Indemnitee acted in "good faith." Although the LPA regrettably does not define "good faith" in this context, we cannot discern a rational distinction between the parties' adoption of this "good faith" standard and Section 7.10(d)'s contractual fiduciary duty, *i.e.*, an Indemnitee acts in good faith if the Indemnitee reasonably believes that its action is in the best interest of, or at least, not inconsistent with, the best interests of K-Sea. If we take seriously our obligation to construe the agreement's "overall scheme," we must conclude that the parties' insertion of a free-standing, enigmatic standard of "good faith" is consistent with Section 7.10(d)'s conceptualization of a reasonable belief that the action taken is in, or not inconsistent with, the best interests of the Partnership. In this LPA's overall scheme, "good faith" cannot be construed otherwise.[61]

We believe the approach taken in *Norton* interpreting essentially the same exculpatory language is more faithful to the specific language of the Enbridge LPA, and does not rely on extra-contractual notions of waste and a heightened pleading burden to plead bad faith. As in *Norton*, and consistent with contract interpretation rules,[62] we believe good faith was intended to be used consistently throughout the LPA. Thus, we depart from our earlier decision in *Brinckerhoff III*,

---

determination that transaction would be accretive to the unitholders did not mean that the transaction was in the best interests of the MLP as an entity).

[61] *Norton*, 67 A.3d at 362 (internal citations omitted).

[62] *See* note 55.

31

and hold that to plead a claim that EEP GP did not act in good faith, Brinckerhoff must plead facts supporting an inference that EEP GP did not reasonably believe that the Alberta Clipper transaction was in the best interests of the Partnership. As our prior cases have established, the use of qualifier "reasonably" imposes an objective standard of good faith.[63]

Here, Brinckerhoff has pled facts supporting an inference that EEP GP did not reasonably believe in good faith that the Alberta Clipper transaction was fair and reasonable to the Partnership. According to the allegations of the complaint, EEP GP and Enbridge Management, through the Director Defendants, knew when approving the transaction that (a) they did not consider the 2009 transaction despite express direction in the LPA that they do so; (b) Enbridge changed its valuation methodology in 2014 when it valued the Alberta Clipper Interest as a multiple of EBITDA, as compared to 2009, when it valued the Alberta Clipper Interest at cost; (c) failed to consider that the Alberta Clipper Interest's projected next year EBITDA was 20% lower than it was in 2009, although valued 25% higher in 2009; (d) failed to negotiate the purchase price despite the negative oil pricing environment, Enbridge's control over the volume flowing through the pipeline, and

---

[63] *Norton*, 67 A.3d at 361, n. 34 (The LPA's "addition of the term 'reasonably' distinguishes it from limited partnership agreements that Delaware courts have interpreted as establishing a purely subjective standard."); *see also DV Realty Advisors LLC*, 75 A.3d at 110, n. 18 (distinguishing from *Norton* and applying a subjective good faith standard because the LPA at issue did not require a "reasonable belief.").

shorter tariff agreements; (e) failed to value the Special Tax Allocation benefits to Enbridge, and the financial detriment to the unaffiliated unitholders; (f) failed to take into consideration the lack of expansion rights sold in 2009; and (g) relied on a purportedly flawed financial opinion.

At the pleading stage of this case, we find that EEP GP cannot rely on Section 6.8(a) to exculpate it from monetary damages.

B.

EEP GP nonetheless claims it is entitled to a conclusive presumption of good faith by relying on Simmons' fairness opinion that the Alberta Clipper transaction "is fair to Partners and to the holders of Partners' common units (other than [Enbridge] and its affiliates) from a financial point of view."[64] Using similar language to that of 8 *Del. C.* § 141(e),[65] Section 6.10(b) of the LPA provides EEP GP with a conclusive presumption of good faith under certain conditions:

> The General Partner may consult with legal counsel, accountants, appraisers, management consultants, investment bankers and other consultants and advisors selected by it, and any act taken or omitted in reliance upon the opinion (including, without limitation, an Opinion of Counsel) of such Persons as to matters that the General Partner reasonably believes to be within such Person's professional or expert

---

[64] App. to Opening Br. at 306-07.
[65] 8 *Del. C.* § 141(e) (emphasis added):
> A member of the board of directors, or a member of any committee designated by the board of directors, shall, in the performance of such member's duties, *be fully protected in relying in good faith upon* . . . any other person as to matters the member *reasonably believes are within such other person's professional or expert competence* and who has been selected with reasonable care by or on behalf of the corporation.

competence shall be conclusively presumed to have been done or omitted in good faith and in accordance with such opinion.[66]

For several reasons, EEP GP has fallen short of making a dispositive, pleading-stage showing that it is entitled to invoke the conclusive presumption of good faith. By its own terms, Section 6.10(b) requires that EEP GP "reasonably believe" that Simmons was professionally equipped to opine on the fairness and reasonableness of the Alberta Clipper transaction in a manner consistent with the requirements of Section 6.6(e). In this case, whether EEP GP could have reasonably believed Simmons was an appropriate advisor depends on the factual record developed through discovery. For present purposes, we must accept as true Brinckerhoff's allegation that EEP GP could not have reasonably relied on a banker that did not consider what Brinckerhoff has alleged to be the most relevant precedent transaction when it was acting under a standard that expressly required consideration of comparable transactions—the 2009 Alberta Clipper transaction. Further, as is the case with Section 141(e) of the Delaware General Corporation Law and as contemplated by Section 6.10(b) of the LPA, qualified advisors are often called upon to provide accounting, tax, and financial advice to the general partner in pursuit of the entity's business. For instance, transaction and tax counsel will often advise the board members on transaction structure. Financial advisors will often advise the board on valuation issues. In those situations, the advice

---

[66] App. to Opening Br. at 280.

established the appropriate methods and terms on which the general partner then acts to consummate a transaction.[67] If Simmons had been charged in the first instance to value the Alberta Clipper Interest, and the Special Committee had reasonably relied on Simmons' valuation to set the sale price, Simmons' role and the Special Committee's reliance on its valuation might be a more comfortable fit with the reliance language of Section 6.10(b).

Instead, according to the complaint's allegations, the financial terms were fully baked by the time Simmons appeared on the scene to render a fairness opinion.[68] Thus, on the record before us, EEP GP did not rely on Simmons in the manner contemplated by Section 6.10(b), and is not entitled to a conclusive presumption of good faith for the Alberta Clipper transaction.

## C.

Defendants next argue, and the Court of Chancery agreed, that reformation and rescission were unavailable as remedies for breach of the LPA, because

---

[67] *See generally* Edward P. Welch et al., *Folk on the Delaware General Corporation Law* § 141.12 (2016) (citing *In re Formica Corp. Shareholders Litig.*, 1989 WL 2581 (Del. Ch. March 22, 1989) (special committee entitled to rely on valuation advice of its investment banker)); *In re Cheyenne Software, Inc. S'holders Litig.*, 1996 WL 652765 (Del. Ch. Nov. 7, 1996) (board entitled to rely on investment banker's opinion in considering a tender offer). *See also In re Walt Disney Co. Deriv. Litig.*, 907 A.2d 693, 770 (Del. Ch. 2005), *aff'd*, 906 A.2d 27 (Del. 2006) (committee's reliance on expert's analysis protected under § 141(e)); *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1134, 1142 (Del. Ch. 1994), *aff'd*, 663 A.2d 1156 (Del. 1995) (board relied in good faith on advice of experienced counsel relevant to overall fairness of the process).

[68] *See* App. to Opening Br. at 83 (Simmons Presentation) ("Valuation had been pre-announced via press-release, with a proposed total transaction value of $916 million . . . subsequently raised 2015 EBITDA forecast to $93 million and transaction value to $1 billion . . . Simmons has been engaged to provide a fairness opinion . . . .").

Brinckerhoff was not excused "from supporting his claims for reformation or rescission with well-pled facts that meet the requisite elements of these remedies."[69] We conclude, however, that the Court of Chancery viewed its remedial authority too narrowly.

The LPA eliminated monetary damages if EEP GP acted in good faith. It did not, however, limit equitable remedies. In the earlier appeal in *Brinckerhoff III*, we remanded to the Court of Chancery before the final decision to determine the sufficiency of Brinckerhoff's claims for reformation and rescission. Following remand, the court believed reformation was a possible remedy for breach of the LPA.[70] We agree with that conclusion.

Once liability has been found, and the court's powers shift to the appropriate remedy, the Court of Chancery has broad discretion to craft a remedy to address the wrong.[71] EEP GP faces potential liability for breach of Section 6.6(e), under a contractual fiduciary standard similar if not identical to entire fairness. As we held in *Gotham Partners, L.P. v. Hallwood Realty Partners, L.P.*, such contractual standards can subject the general partner to equitable relief:

---

[69] *Brinckerhoff IV*, 2016 WL 1757283, at *19.
[70] *Brinckerhoff II*, 2012 WL 1931242, at *2.
[71] *Int'l Telecharge, Inc. v. Bomarko, Inc.*, 766 A.2d 437, 439 (Del. 2000) (noting that the Delaware Supreme Court "defer[s] substantially to the discretion of the trial court in determining the proper remedy"); *Weinberger v. UOP, Inc.*, 457 A.2d 701, 715 (Del. 1983) (noting "the broad discretion of the Chancellor to fashion such relief as the facts of a given case may dictate").

The Partnership Agreement provides for contractual fiduciary duties of entire fairness. Although the contract could have limited the damage remedy for breach of these duties to contract damages, it did not do so. The Court of Chancery is not precluded from awarding equitable relief as provided by the entire fairness standard where, as here, the general partner breached its contractually created fiduciary duty to meet the entire fairness standard and the partnership agreement is silent regarding damages.[72]

At this stage in the proceedings, Brinckerhoff will not be limited to a specific equitable remedy. Whether an equitable remedy should be ordered will depend on the Vice Chancellor's assessment of the equities, which include the practicality of an equitable remedy given the passage of time, and the ability to order equitable relief tailored to the harm caused by a breach of the LPA.

## V.

Finally, Brinckerhoff argues that the Court of Chancery erred in dismissing his claims against Enbridge and the Remaining Defendants for breach of residual fiduciary duties, aiding and abetting breach of contract, and tortious interference with the LPA. Because the secondary liability claims raise interesting issues that would benefit from a more fully developed record, we will await the Court of Chancery's determination of these issues.

## VI.

Because we have determined that Brinckerhoff has pled a viable claim for breach of the express terms of the LPA, we reverse the Court of Chancery's April

---

[72] 817 A.2d 160, 175 (Del. 2002).

29, 2016 decision and remand the matter for further proceedings consistent with this Opinion. It is further ordered that the time within which a motion for reargument may be timely filed under Supreme Court Rule 18 is shortened to five days from the date of this Opinion.