# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

MS. MARY GIDDINGS WENSKE,
INDIVIDUALLY AND AS TRUSTEE OF
THE THOMAS HUNTER GIDDINGS, JR.
TRUST U/W/O THOMAS H. GIDDINGS
DATED 5/23/2000,

    Plaintiffs,

    v.

BLUE BELL CREAMERIES, INC., BLUE
BELL CREAMERIES, U.S.A., INC.,
PAUL W. KRUSE, JIM E. KRUSE,
HOWARD W. KRUSE, GREG BRIDGES,
RICHARD DICKSON, WILLIAM J.
RANKIN, DIANA MARKWARDT,
JOHN W. BARNHILL, JR., PAUL A.
EHLERT, DOROTHY MCLEOD
MACINERNEY, PATRICIA RYAN,

    Defendants.

    and

BLUE BELL CREAMERIES, L.P.,

    Nominal Defendant.

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

**C.A. No. 2017-0699-JRS**

## MEMORANDUM OPINION

Date Submitted: April 18, 2018
Date Submitted: July 6, 2018

Jessica Zeldin, Esquire of Rosenthal, Monhait & Goddess, P.A., Wilmington, Delaware and Scott G. Burdine, Esquire and David E. Wynne, Esquire of Burdine Wynne LLP, Houston, Texas, Attorneys for Plaintiffs.

Timothy R. Dudderar, Esquire and Travis R. Dunkelberger, Esquire of Potter Anderson & Corroon LLP, Wilmington, Delaware, Attorneys for Defendants Blue Bell Creameries, Inc., Blue Bell Creameries, U.S.A., Inc., Jim E. Kruse, Howard W. Kruse, Richard Dickson, William J. Rankin, Diana Markwardt, John W. Barnhill, Jr., Paul A. Ehlert, Dorothy McLeod MacInerney, Patricia Ryan, and Nominal Defendant Blue Bell Creameries, L.P.

Srinivas M. Raju, Esquire and Kelly L. Freund, Esquire of Richards, Layton & Finger, P.A., Wilmington, Delaware, Attorneys for Defendants Greg Bridges and Paul W. Kruse.

**SLIGHTS, Vice Chancellor**

Whether conduct is right or wrong in the eyes of the law, actionable or not actionable, depends in large part upon the standard by which the conduct is measured. A driver operating a motor vehicle at 70 miles per hour on Route One in Dover, Delaware is driving in excess of the posted 65 miles per hour speed limit. The conduct is wrong—actionable as a matter of law—because it violates the standard for safe travel as determined by Delaware's General Assembly and Department of Transportation. That same driver operating the same vehicle at the same speed on Interstate 81 outside of Lexington, Virginia, however, will garner no attention from the State Trooper waiting behind the overpass. The speed limit there is 70 miles per hour. The conduct is not wrong under the applicable standard and is not, therefore, actionable.

Delaware entity law is no different. A manager's act or omission may not be actionable under equitable fiduciary standards applicable in the corporate context but may be actionable in the alternative entity context when measured under a heightened contractual standard. This case presents that dynamic in the context of the duty of oversight. In our corporate law, "director liability based on the duty of oversight 'is possibly the most difficult theory . . . upon which a plaintiff might hope to win a judgment.'"[1] "The presumption of the business judgment rule, the

---

[1] *In re Citigroup, Inc. S'holder Deriv. Litig.*, 964 A.2d 106, 125 (Del. Ch. 2009) (quoting *In re Caremark Int'l Inc. Deriv. Litig.*, 698 A.2d 959, 967 (Del. Ch. 1996)).

protection of an exculpatory § 102(b)(7) provision, and the difficulty of proving a *Caremark* claim together function to place an extremely high burden on a plaintiff to state a claim for personal director liability for a failure to see the extent of a company's business risk."[2]   In the alternative entity context, however, those impediments either do not exist as a matter of law or can be eliminated by contract. Indeed, the standard by which the managers of an alternative entity must monitor and address operational risk will largely depend upon what the parties say about those standards in the operative entity agreement.[3]

This is a limited partner derivative action.  Plaintiffs are limited partners of Blue Bell Creameries, L.P. ("Blue Bell" or the "Company"), a Delaware limited partnership in the business of manufacturing ice cream products.  Blue Bell is managed by its general partner, Blue Bell Creameries, Inc. ("BB GP"), a wholly-owned subsidiary of Blue Bell Creameries USA, Inc. ("BB USA").  In early 2015, the Food & Drug Administration ("FDA") and several state health agencies found

---

[2]   *Id.*

[3]   Of course, if the entity agreement is silent in this regard, the traditional fiduciary duties of loyalty and care apply by default to the entity's managers. *See, e.g.*, *Feeley v. NHAOCG, LLC*, 62 A.3d 649, 662 (Del. Ch. 2012) (stating that general partners, managers and managing members "owe default fiduciary duties"); *see also* 6 *Del. C.* § 18–1104 ("In any case not provided for in [the LLC Act], the rules of law and equity, including the rules of law and equity relating to fiduciary duties and the law merchant, shall govern.").

*Listeria monocytogenes* bacteria in Blue Bell ice cream products.[4] By April 2015, Blue Bell had recalled all of its products and shut down all of its production operations. Soon thereafter, the Company fired or suspended more than half of its workforce and ceased paying distributions to its limited partners. Ultimately, it was "fined by government authorities for its poor safety policies and practices related to the [*Listeria*] outbreak."[5]

Plaintiffs have brought this action on behalf of Blue Bell against BB GP, BB USA and certain directors and officers of BB GP and BB USA (the "Individual Defendants"). Their Verified Derivative Complaint (the "Complaint") sets forth four counts:

■ Count I, against BB GP, for breach of Blue Bell's limited partnership agreement (the "LPA");

■ Count II, against BB USA, "as controller, principal, and joint venturer" of BB GP, and the Individual Defendants, as "controllers" of BB GP, "for causing BB GP to breach the LPA"[6];

---

[4] *Listeria monocytogenes* is a pathogenic bacterium that causes listeriosis, a serious infection that kills approximately 260 people per year in the United States. Verified Derivative Compl. ("Compl.") ¶ 2; U.S. Dep't of Health & Human Servs. (CDC), *Listeria (Listeriosis)*, https://www.cdc.gov/listeria/index.html (last updated June 29, 2017); D.R.E. 202(b)–(c) (The court may take judicial notice of facts "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.").

[5] Compl. ¶ 2.

[6] Compl., p. 37 & ¶ 66 (capitalization altered).

3

■ Count III, against BB USA and the Individual Defendants, for aiding and abetting BB GP's breach of its "contractual fiduciary duties" under the LPA[7];

■ Count IV, against BB USA and the Individual Defendants, "for breach of common law fiduciary duties" owed to Blue Bell.[8]

Defendants have moved to dismiss the Complaint under Court of Chancery Rules 23.1 and 12(b)(6).

For the reasons that follow, Defendants' motion is DENIED as to Count I of the Complaint, and GRANTED as to Counts II, III and IV, which are dismissed with prejudice pursuant to Court of Chancery Rule 12(b)(6). As explained below, Plaintiffs have pled a set of facts that allow a reasonable inference that BB GP breached the LPA by failing to manage Blue Bell "in accordance with sound business practices in the industry" as required by LPA § 6.01(e). They have also pled demand futility with respect to Count I and have thus earned the right to take discovery in support of that claim. They have not, however, advanced any viable legal theory under which BB USA or the Individual Defendants may be liable for BB GP's alleged breach of the LPA. Nor have they pled a viable breach of fiduciary duty claim against BB USA or the Individual Defendants.

---

[7]  Compl., pp. 34, 37.

[8]  Compl. ¶ 80.

4

# I. FACTUAL BACKGROUND

The facts are drawn from the allegations in the Complaint, documents integral to the Complaint or incorporated therein by reference and those matters of which the Court may take judicial notice. For purposes of this motion to dismiss, I accept as true the Complaint's well-pled factual allegations and draw all reasonable inferences in Plaintiffs' favor.

## A. The Parties

Plaintiffs, Mary Giddings Wenske and the Thomas Hunter Giddings, Jr. Trust U/W/O Thomas H. Giddings dated 05/23/2000, are limited partners of nominal defendant, Blue Bell, a Delaware limited partnership headquartered in Brenham, Texas.[9] Blue Bell manufactures a variety of ice cream products that are distributed throughout the southern United States. The Company has three production plants: one located in Brenham, Texas (the "Texas Plant"), one in Broken Arrow, Oklahoma (the "Oklahoma Plant") and one in Sylacauga, Alabama (the "Alabama Plant").[10]

---

[9] Compl., pmbl. & ¶¶ 7–8.

[10] Compl. ¶ 2.

Defendant BB GP, a Delaware corporation, is Blue Bell's general partner, and a wholly-owned subsidiary of BB USA.[11] Under Blue Bell's LPA, BB GP is vested with the exclusive authority to manage Blue Bell's business and affairs.[12]

Defendant BB USA is a Delaware corporation that serves as a holding company. Its only assets are (1) its 100% ownership interest in BB GP, and (2) approximately 2,823 Class A limited partnership interests in Blue Bell.

The Individual Defendants are:

■ Howard Kruse, a BB USA director, and BB GP's CEO and President from 1993 to 2004;

■ Paul Kruse, a director of BB USA and BB GP, and BB GP's CEO and President from 2004 to 2017;

■ Jim Kruse, a director of BB USA and BB GP, and the current chairman of each corporation's board of directors;

■ Richard Dickson, a director of BB USA and BB GP, and the current President of BB USA and BB GP;

■ Greg Bridges, a BB USA director, and BB USA's Executive Vice President of Plant Operations;

■ William Rankin, a director of BB USA and BB GP, and BB GP's Chief Financial Officer;

---

[11] Compl. ¶¶ 9–10.

[12] LPA §§ 6.01(a), 6.10.

■ Diana Markwardt, the "Vice President of Office Operations at Blue Bell" and an "Associate Director" of BB USA and BB GP[13]; *and*

■ BB USA directors John Barnhill, Jr., Paul Ehlert, Patricia Ryan and Dorothy McLeod MacInerney.

## B. The 2015 Product Recall

As of 2014, Blue Bell was the third largest ice cream manufacturer in the United States. Its products were sold to consumers in twenty-three states, and it generated revenues of over $850 million annually.[14] In January 2015, South Carolina state health inspectors discovered *Listeria monocytogenes* bacteria in a routine sampling of Blue Bell products.[15] Soon thereafter, FDA and state health agencies in Texas and Kansas found *Listeria* contamination in other Blue Bell ice cream products.[16] The contamination was not contained; the Centers for Disease Control identified ten people who contracted listeriosis as a result of the contamination, three of whom died.[17]

---

[13] Compl. ¶ 18.

[14] Compl. ¶ 2.

[15] Compl. ¶ 43.

[16] *Id.*

[17] Compl. ¶¶ 2, 43.

These revelations devastated Blue Bell's business. By April 2015, Blue Bell had shut down all of its production operations and instituted a recall of all products.[18] The Company thereafter fired or furloughed two-thirds of its workforce and ceased paying distributions to its limited partners.[19] Blue Bell was "fined by government authorities for its poor safety policies and practices related to the [*Listeria*] outbreak,"[20] and "[a] criminal DOJ investigation also ensued."[21]

Contemporaneous FDA inspections of Blue Bell's Texas and Oklahoma Plants revealed a multitude of food safety hazards at those facilities.[22] FDA investigators inspecting the Texas Plant in March, April and May 2015 observed, among other things:

> ■ "[f]ailure to manufacture and package foods under conditions and controls necessary to minimize the potential for growth of microorganisms,"[23] such that certain of Blue Bell's ice cream products were contaminated by *Listeria monocytogenes*;

---

[18] Compl. ¶¶ 43–44. The reaction among consumers was hardly surprising given that many of Blue Bell's customers were children, schools and hospitals. Compl. ¶ 3.

[19] Compl. ¶ 7.

[20] Compl. ¶ 2.

[21] *Id.*

[22] *See* FDA Form 483 (Inspectional Observations) Concerning FEI # 1682009, issued May 1, 2015 ("FDA Observations (Texas Plant)"); FDA Form 483 (Inspectional Observations) Concerning FEI # 1000118167, issued Apr. 23, 2015 ("FDA Observations (Oklahoma Plant)").

[23] FDA Observations (Texas Plant) at 1.

■ that "[t]he procedure used for cleaning and sanitizing [plant] equipment ha[d] not been shown to provide adequate cleaning and sanitizing treatment"[24];

■ that "[t]he plant [was] not constructed in such a manner as to prevent condensate from contaminating food and food-contact surfaces," and condensate was, in fact, "dripping directly into ice cream products" in four separate instances[25]; and

■ "[f]ailure to clean food-contact surfaces as frequently as necessary to protect against contamination of food."[26]

FDA inspections of the Oklahoma Plant in March and April 2015 yielded similar observations, including:

■ "[f]ailure to manufacture and package foods under conditions and controls necessary to minimize the potential for growth of microorganisms and contamination"[27];

■ "[f]ailure to perform microbial testing where necessary to identify sanitation failures and possible food contamination"[28];

■ "fail[ure] to demonstrate [that Blue Bell's] cleaning and sanitizing program [wa]s effective in controlling recurring [*Listeria*] contamination[]"[29];

---

[24] *Id.* at 2.

[25] *Id.* at 2–3.

[26] *Id.* at 3. Such observations, however, "do not represent a final [FDA] determination regarding [the inspectee's] compliance" with applicable federal law. *Id.* at 1.

[27] FDA Observations (Oklahoma Plant) at 1.

[28] *Id.* at 2.

[29] *Id.* at 3.

■ that "[t]he plant [was] not constructed in such a manner as to prevent condensate [drip] from contaminating food, food-contact surfaces, and food-packaging materials"[30]; and

■ that "[a]ll reasonable precautions [we]re not taken to ensure that production procedures d[id] not contribute contamination from any source."[31]

Moreover, it is alleged that Blue Bell was already aware of contamination issues at the Oklahoma Plant and, therefore, did not need the FDA to tell management there was a problem.[32] Indeed, Blue Bell had discovered *Listeria* bacteria in the Oklahoma Plant "on at least 5 separate occasions in 2013 and on 10 more occasions in 2014, including multiple positive samples on a Pint Packing Chute and multiple positive samples from [a half-gallon] filler machine."[33] Despite these discoveries, Blue Bell "never conducted . . . [a] root cause analysis to determine the source of the [*Listeria* bacteria], did not increase the frequency or scope of its *Listeria* testing protocol, did not disassemble any equipment, and did not take any effective action to [mitigate] the continuing and growing *Listeria* threat, much less eradicate it."[34]

---

[30] *Id.* at 6.

[31] *Id.* at 8.

[32] The Complaint does not identify health-related issues at the Alabama Plant.

[33] Compl. ¶ 42.

[34] *Id.*

Following the 2015 product recall, Blue Bell's revenues fell by more than half.[35] The Company was required to pay substantial fines, penalties and personal injury settlements. And distributions to limited partners were cut from $4,000 per unit, paid quarterly, to $0 per unit.[36] As noted, the United States Department of Justice also opened a criminal investigation, although it ultimately did not bring any charges.[37]

## C. Blue Bell's Limited Partnership Agreement

Blue Bell is governed by the LPA, which vests BB GP with the exclusive authority to manage the Company's business and affairs.[38] Of particular relevance here are Sections 6.01(e) and 6.11(d). Section 6.01(e) provides, in pertinent part:

> [BB GP] shall use its best efforts to conduct [Blue Bell's] business in a good and businesslike manner, *and in accordance with sound business practices in the industry.* [BB GP] shall not be liable . . . to any Partner or [to Blue Bell] for any losses sustained or liabilities incurred [due to] errors in judgment of [BB GP], excluding those that are attributable to [BB GP's] gross negligence, bad faith [or] breach of any material provision of [the LPA] or willful misconduct.[39]

---

[35] Compl. ¶ 7.

[36] Compl. ¶¶ 2, 63, 70, 77, 85.

[37] Compl. ¶ 2.

[38] LPA §§ 6.01(a) ("[BB GP] shall have the exclusive right and full authority to manage, conduct, control and operate [Blue Bell's] business"), 6.10 ("No Limited Partner . . . may take part in the management . . . of [Blue Bell's] business and affairs.").

[39] LPA § 6.01(e) (emphasis supplied). The LPA does not elaborate on what constitute "sound business practices in [Blue Bell's] industry," *id.*, nor does it define or otherwise

And Section 6.11(d) provides, in full:

Any standard of care and duty imposed by [the LPA] or under the [Delaware Revised Uniform Limited Partnership Act] or any applicable law, rule or regulation shall be modified, waived or limited, to the extent permitted by law, as required to permit [BB GP] to act under [the LPA] or any other agreement contemplated by [the LPA] and to make any decision under the authority prescribed in [the LPA], so long as the action is reasonably believed by [BB GP] to be in, or not inconsistent with, [Blue Bell's] best interests.[40]

## D. "Sound Business Practices" in Blue Bell's Industry

According to the Complaint, "sound business practices" in Blue Bell's industry—the dairy industry—"require controlling or eliminating condensation in the plant environment, properly cleaning and sanitizing plant surfaces, adequately testing for contamina[nts] such as Listeria . . . and determining and correcting the[] cause [of bacterial contamination] if discovered."[41]  In support of that proposition, the Complaint cites:

■ "[f]ederal and state food safety laws, regulations, recommendations and guidelines,"[42] including—

---

indicate the meaning of the operative terms "best efforts" or "sound" as they appear in LPA § 6.01(e).

[40] LPA § 6.11(d).

[41] Compl., p. 14.

[42] Compl. ¶ 3.

12

☐ the FDA regulations codified at 21 C.F.R. Part 110,[43] which implement certain provisions of the Federal Food, Drug and Cosmetic Act ("FDCA")[44];

☐ the FDA Food Safety Modernization Act ("FSMA")[45] and the regulations implementing the FSMA[46]; and

☐ a 2008 FDA guidance document entitled "Guidance for Industry: Control of *Listeria monocytogenes* in Refrigerated or Frozen Ready-To-Eat Foods - Draft Guidance"[47]; *and*

■ "dairy industry organization food safety . . . guidelines," including guidelines issued by the Dairy Practices Council ("DPC") and the International Dairy Foods Association ("IDFA").[48]

### 1. Applicable Federal Laws, Regulations and Guidelines

Under the FDCA, food manufacturers such as Blue Bell may not introduce "adulterated" food "into interstate commerce."[49] FDA regulations establish various

---

[43]  *Id.*

[44]  52 Stat. 1040 (1938) (codified as amended at 21 U.S.C. §§ 301–399h (2012)).

[45]  Pub.L. 111–353, 124 Stat. 3885 (2011) (codified in relevant part at 21 U.S.C. § 350g).

[46]  Compl. ¶ 36 (quoting 21 U.S.C. § 350g(n)(1)(A) and referring to "FSMA requirements").

[47]  Compl. ¶ 35 (citing U.S. Dept. of Health and Human Servs. (FDA), *Guidance for Industry*: *Control of* Listeria monocytogenes *in Refrigerated or Frozen Ready-To-Eat Foods - Draft Guidance* (the "2008 FDA Guidance"), *available online at* https://www.regulations.gov/document?D=FDA-2008-D-0096-0002).

[48]  Compl. ¶¶ 3, 29–33.

[49]  21 U.S.C. § 331(a).  The FDCA is administered by the FDA, a federal agency within the Department of Health and Human Services.  *Id.* § 393.  Food is "adulterated" within the meaning of the FDCA if it "bears or contains any poisonous or deleterious substance which may render it injurious to health," *id.* § 342(a)(1), or "has been prepared, packed,

13

criteria for determining whether food is "adulterated" within the meaning of the FDCA, including criteria for "good manufacturing practice" in producing, packing and storing human food. Relevant here are the FDA regulations codified at 21 C.F.R. Part 110, which provide, in pertinent part:

■ Food processing plants must "[b]e constructed in such a manner that . . . drip or condensate from fixtures, ducts and pipes does not contaminate food, food-contact surfaces, or food-packaging materials."[50]

■ "All plant equipment . . . shall be so designed . . . as to be adequately cleanable . . . and shall be adequately maintained."[51]

■ "All operations in the . . . manufacturing, packaging, and storing of food shall be conducted in accordance with adequate sanitation principles."[52] In this regard:

☐ "[a]ll reasonable precautions shall be taken to ensure that production procedures do not contribute contamination from any source"[53];

☐ "[e]quipment and utensils and finished food containers shall be maintained in an acceptable condition through appropriate cleaning and sanitizing, as necessary"[54]; and

---

or held under insanitary conditions whereby it may have become contaminated with filth . . . [or] been rendered injurious to health." *Id.* § 342(a)(4).

[50] 21 C.F.R. § 110.20(b)(4).

[51] *Id.* § 110.40(a).

[52] *Id.* § 110.80. The term "adequate," as used in 21 C.F.R. Part 110, "means that which is needed to accomplish the intended purpose in keeping with good public health practice." *Id.* § 110.3(b).

[53] *Id.* § 110.80.

[54] *Id.* § 110.80(b)(1).

14

☐ "[a]ll food manufacturing . . . shall be conducted under such conditions and controls as are necessary to minimize the potential for the growth of microorganisms, or for the contamination of food."[55]

Also relevant are FDA regulations promulgated under the FSMA, which provide, in pertinent part, that owners and operators of food processing facilities "must identify and implement preventive controls to provide assurances that any [food safety] hazards . . . will be significantly minimized or prevented. . . ."[56] "Preventative controls include . . . procedures, practices, and processes to ensure that the facility is maintained in a sanitary condition adequate to significantly minimize or prevent hazards such as environmental pathogens, biological hazards due to employee handling, and food allergen hazards" ("sanitation controls").[57] And "sanitation controls must include, as appropriate to the facility and the food, procedures, practices, and processes for the . . . cleanliness of food-contact surfaces, including food-contact surfaces of utensils and equipment."[58]

In addition to promulgating regulations, FDA also periodically issues "guidance documents," which "represent FDA's current thinking on a topic."[59]

---

[55] *Id.* § 110.80(b)(2).

[56] 21 C.F.R. § 117.135(a)(1); Compl. ¶ 36 (referencing "FSMA requirements").

[57] 21 C.F.R. § 117.135(c)(3).

[58] *Id.* § 117.135(c)(3)(i).

[59] U.S. Dep't of Health & Human Servs. (FDA), *Food Guidance & Regulation*, https://www.fda.gov/Food/GuidanceRegulation/default.htm (last updated Jan. 30, 2018); D.R.E. 202(b)–(c). It should be noted that general policy statements in agency

15

Relevant here is a 2008 FDA guidance document entitled "Guidance for Industry - Control of *Listeria monocytogenes* in Refrigerated or Frozen Ready-To-Eat Foods - Draft Guidance,"[60] which provides that:

■ "Food contact surfaces should be tested for *Listeria* at least every week and that non-food-contact surfaces should be tested every two weeks"[61];

■ "If [a food processing] plant only tests representative samples, it must ensure that it samples all food contact surfaces at least once each month and that the smallest producers take samples from at least five sites of food contact surfaces in each production line"[62]; and

■ "If [a plant] detect[s] *Listeria* species or *L. monocytogenes* on a critical surface or area or in food, [the plant should] follow a corrective action plan, . . . determine the source of the contamination, . . . [and] [c]onduct additional sampling and testing to determine whether the contamination has been eliminated."[63]

## 2. Relevant Industry Organization Guidelines

Per the Complaint, in addition to complying with state and federal food safety laws and regulations, "sound business practices" in the dairy industry require Blue

---

guidance documents do not have the force of law. *See Pac. Gas & Elec. Co. v. Fed. Power Comm'n*, 506 F.2d 33, 38 (D.C. Cir. 1974) ("[A] general statement of policy . . . does not establish a 'binding norm.'") (citation omitted).

[60] *See* Compl. ¶ 35 (citing 2008 FDA Guidance). It appears that the 2008 FDA Guidance is a *draft* guidance document. *See* 2008 FDA Guidance at 1 ("This draft guidance, when finalized, will represent [FDA's] current thinking on this topic.").

[61] Compl. ¶ 35 (citing 2008 FDA Guidance at 28–29).

[62] Compl. ¶ 35 (citing 2008 FDA Guidance at 28).

[63] Compl. ¶ 35 (quoting 2008 FDA Guidance at 30) (internal quotation marks omitted).

16

Bell to adhere to food safety guidelines issued by the DPC and the IDFA.[64]  The

DPC is "a nonprofit organization of education, dairy industry and regulatory

personnel[] [that] issues written guidelines for the dairy industry that are widely

followed."[65]  The IDFA is "an industry organization whose members represent more

than 85% of the ice cream, frozen desserts, milk, cultured products, and cheese

products produced and marketed in the U.S. . . . ."[66]

The Complaint identifies several DPC food safety guidelines that are relevant

to Blue Bell's manufacturing operations.[67]  Most notable are the DPC's 1998

"Guidelines for Frozen Dessert Processing," DPC 61, which state that:

> [P]rocessing methods applicable to frozen desserts offer excellent
> opportunities for contamination by pathogenic organisms. . . . *Listeria*
> has been frequently isolated from floor drains and other areas where
> pooling of water or other processing wastes occur. . . . Keeping floors,
> walls and ceilings clean, relatively dry and free from condensate is
> imperative. . . . As a starting point, an initial microbiological survey
> should be made of the processing facility, and plans should be
> implemented that focus on continuous improvement to the

---

[64]  Compl. ¶¶ 3, 29–33.

[65]  Compl. ¶ 29.

[66]  Compl. ¶ 33.

[67]  Compl. ¶¶ 29–32.  These guidelines are (1) DPC, *DPC 56, Dairy Product Safety (Pathogenic Bacteria) for Fluid Milk and Frozen Dessert Plants* (1994) ("DPC 56"); (2) DPC, *DPC 8, Good Manufacturing Practices for Dairy Processing Plants* (1995) ("DPC 8"); (3) DPC, *DPC 60, Trouble Shooting Microbial Defects in Dairy Processing Plants* ("DPC 60"); and (4) DPC, *DPC 61, Guidelines for Frozen Dessert Processing* (1998) ("DPC 61").

environment. . . . [F]requent microbiological surveys are very important to the processing plant environment.[68]

DPC 61 also emphasizes that (1) "[e]ffective plant sanitation through the development and implementation of written [sanitation SOPs] is essential to improve food safety," and (2) "[e]ffective audit and verification procedures are essential components of comprehensive sanitation programs, including environmental sampling and evaluating the cleanliness of food contact surfaces."[69]

Also relevant to Blue Bell's plant operations, per the Complaint, are the guidelines in the IDFA's 2002 Hazard Analysis and Critical Control Point ("HACCP") plant manual.[70] There, the IDFA recommends, among other things, "that [plant] equipment be easily cleanable and maintained in a manner that prevents contamination of food[;] that floors, walls, and ceilings in the plant be clean and free from condensate[;] that impervious materials be used in processing areas whenever possible to minimize harborages for pathogenic materials[;] that potential areas of post-pasteurization contamination should be determined and corrected[;] and that

---

[68] Compl. ¶ 32 (quoting DPC 61).

[69] *Id.* (quoting DPC 61).

[70] Compl. ¶ 33 (citing the IDFA's 2002 HACCP plant manual).

'[a]ny coliform level detected during environmental sampling should generate a review of plant practices.'"[71]

### E. Procedural History

Plaintiffs commenced this derivative action on October 2, 2017. Defendants moved to dismiss the Complaint under Court of Chancery Rules 23.1 and 12(b)(6) on November 20, 2017. According to Defendants, the Complaint fails to plead demand futility under Rule 23.1 because Defendants do not face a substantial likelihood of liability on any of the Complaint's four Counts. Specifically, they argue: (1) as to Count I, the LPA embodies a permissive governance scheme that requires Plaintiffs to plead bad faith in order to state a claim for breach of LPA § 6.01(e) and the Complaint falls short of that mark; (2) Delaware law recognizes no theory of controller or "joint venturer" liability as pled in Count II; (3) likewise, Delaware law recognizes no claim for aiding and abetting a breach of contract as pled in Count III; and (4) the LPA disclaims fiduciary duties so there can be no breach of fiduciary duty as pled in Count IV.

The Court heard oral argument on Defendants' motion to dismiss on April 5, 2018. Thereafter, with the Court's permission, Plaintiffs filed a sur-reply brief in which they address Defendants' arguments respecting the agency and joint venture

---

[71] Compl. ¶ 33 (quoting the IDFA's 2002 HACCP plant manual).

theories of liability advanced in Count II of the Complaint.[72] This is the Court's decision on Defendants' motion.

## II. LEGAL ANALYSIS

The motion to dismiss presents two issues: (1) whether the Complaint states any claim(s) upon which relief can be granted; and (2) whether a pre-suit demand on Blue Bell's general partner, BB GP, is excused with respect to such claim(s).

For reasons explained below, I conclude that (1) Count I of the Complaint states a viable breach of contract claim; namely, that BB GP breached Section 6.01(e) of the LPA; (2) Counts II–IV do not state any viable claim(s) and, therefore, must be dismissed pursuant to Court of Chancery Rule 12(b)(6); and (3) based on the Complaint's particularized factual allegations, pre-suit demand on BB GP with respect to Count I would have been futile and is therefore excused.

### A. Does the Complaint Plead Viable Claims Under Rule 12(b)(6)?

"The standards governing a motion to dismiss for failure to state a claim are well settled: (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are 'well-pleaded' if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving

---

[72] Pls.' Sur-Reply Br. in Opp'n to Defs.' Mot. to Dismiss. Plaintiffs' sur-reply brief contends that Plaintiffs have sufficiently pled that (1) "BB[ ]USA is liable as BB[ ]GP's principal," *id.* at 1; and (2) "BB[ ]USA is liable as a joint venturer with BB[ ]GP." *Id.* at 6.

party; and [(iv)] dismissal is inappropriate unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof."[73]

### 1. Count I - Breach of Contract

Under Delaware law, a breach of contract claim comprises three elements: (1) the existence of a contract; (2) a breach of an obligation imposed by that contract; and (3) resultant damages.[74] Here, Count I charges that BB GP failed to "use its best efforts to conduct [Blue Bell's] business . . . in accordance with sound business practices in the industry,"[75] in violation of LPA § 6.01(e), and that, as a result of that violation, "Blue Bell lost a substantial portion of its value . . . [and was] forced to pay personal injury settlements, fines and penalties."[76]

According to the Complaint, "sound business practices in [Blue Bell's] industry" require "controlling or eliminating condensation in the plant environment, properly cleaning and sanitizing plant surfaces, adequately testing for contamina[nts] such as Listeria . . . and determining and correcting the[] cause

---

[73] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002) (footnotes and internal quotation omitted).

[74] *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003).

[75] Compl. ¶ 58 (quoting LPA § 6.01(e)).

[76] Compl. ¶ 63. The Complaint styles Count I as a claim for "breach of contractual fiduciary duties." Compl., p. 34 (capitalization altered). As explained below, however, Count I is properly characterized as a breach of contract claim.

[of bacterial contamination] if discovered."[77]  The Complaint goes on to explain, in substantial detail, how BB GP (allegedly) failed to use its best efforts to (1) "control[] or eliminat[e] condensation" in Blue Bell's Texas and Oklahoma Plants; (2) "properly clean[] and sanitiz[e] . . . surfaces" in those facilities; (3) "adequately test[] for" *Listeria* bacteria in the Oklahoma Plant; and (4) "determin[e] and correct[] the[] cause" of *Listeria* contamination in that facility.[78]

According to Defendants, despite the Complaint's detailed references to the "sound business practices in the industry" from which BB GP allegedly deviated, Count I nevertheless fails to state a claim for three reasons:

■ First, Defendants argue that Plaintiffs' interpretation of LPA § 6.01(e) is incorrect, in that Section 6.01(e) cannot be read to incorporate the DPC and IDFA guidelines cited in the Complaint.[79]  Thus, even if BB GP made no effort to conduct Blue Bell's business in accordance with those guidelines, BB GP's omission in that regard would not constitute a breach of LPA § 6.01(e).

■ Second, Defendants more broadly submit that LPA § 6.01(e) "does not provide any guidance as to . . .  what constitutes 'sound business practices in the industry,'"[80] and that "[t]he absence of such guidance . . .

---

[77]  Compl., p. 14.

[78]  *See* Compl. ¶¶ 37–47.

[79]  Defs.' Opening Br. in Supp. of Their Joint Mot. to Dismiss ("DOB") 30–32.

[80]  DOB at 32.

renders Plaintiffs' interpretation [of that provision] impossible to enforce and therefore unreasonable."[81]

■ Finally, Defendants contend that, in light of the language in LPA § 6.11(d), "the only reasonable interpretation of [LPA § 6.01(e)] is that it requires [BB GP] to make a good faith effort to 'conduct [Blue Bell's] business . . . in accordance with sound business practices in the industry'"[82]—whatever those practices might be—and that Plaintiffs have not well pled that BB GP lacked good faith in connection with its oversight of Blue Bell's operations.

For the reasons set forth below, I am satisfied that Defendants' interpretation of the LPA is unreasonable as a matter of law and that Count I states a viable derivative claim for breach of contract against BB GP.

### a. The LPA Is a Binding Contract that Imposes a "Best Efforts" Oversight Obligation on BB GP

The LPA is a contract, and BB GP, as Blue Bell's general partner, is bound by it.[83] The parties do not dispute that LPA § 6.01(e) imposes an obligation on BB GP. They do dispute, however, what that obligation entails. The parties' disagreement in this regard reduces to two issues: (1) the proper interpretation of

---

[81] *Id.*

[82] *Id.* at 37 (quoting LPA § 6.01(e)).

[83] *Norton v. K-Sea Transp. P'rs L.P.*, 67 A.3d 354, 360 (Del. 2013) ("Limited partnership agreements are a type of contract."); 6 *Del. C.* § 17–101(12) ("A partner of a limited partnership . . . is bound by the partnership agreement whether or not the partner . . . executes the partnership agreement.").

LPA § 6.01(e)'s "best efforts" clause; and (2) whether LPA § 6.11(d) "modifies" LPA § 6.01(e). I address each issue in turn.

Under Delaware law, limited partnership agreements, like other contracts, must be construed in "accordance with their terms to give effect to the parties' intent."[84] "The proper construction of [the operation of] any contract . . . is purely a question of law,"[85] as is the proper interpretation of specific contractual language.[86] When interpreting contractual language, the court must ascertain "what a reasonable person in the position of the parties [at the time of contracting] would have thought [that language] meant."[87] In that regard, the interpreting court will give words "their plain meaning unless it appears that the parties intended a special meaning."[88] And, in the case of an undefined term, the interpreting court may consult the dictionary, if that is deemed useful, when determining the term's plain meaning.[89]

---

[84] *Norton*, 67 A.3d at 360.

[85] *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992).

[86] *See Allied Capital Corp. v. GC-Sun Hldgs., L.P.*, 910 A.2d 1020, 1030 (Del. Ch. 2006) ("[T]he proper interpretation of language in a contract is a question of law.").

[87] *Rhone-Poulenc*, 616 A.2d at 1196; *see Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006).

[88] *Norton*, 67 A.3d at 360 (citing *AT&T Corp. v. Lillis*, 953 A.2d 241, 252 (Del. 2008)).

[89] *See Lorillard Tobacco*, 903 A.2d at 738 ("Under well-settled case law, Delaware courts look to dictionaries for assistance in determining the plain meaning of terms which are not defined in a contract.").

Here, LPA § 6.01(e) provides, in pertinent part, that "[BB GP] shall use its best efforts to conduct [Blue Bell's] business . . . in accordance with sound business practices in the industry." To ascertain the meaning of this clause, the Court must assess the import of its key constituent terms; namely, "best efforts," "sound" and "industry." The clause's syntax makes clear that the "industry" referred to is Blue Bell's industry—the dairy industry.[90] The LPA nowhere indicates, however, what meaning the parties attach to the key terms "best efforts" and "sound" as they appear in LPA § 6.01(e). It is appropriate, therefore, to consult the dictionary to ascertain the plain meaning of those terms.[91]

According to conventional dictionary definitions, the term "best efforts" means "[d]iligent attempts to carry out an obligation,"[92] and the term "sound" means "based on thorough knowledge and experience" or, alternatively, "agreeing with

---

[90] In LPA § 6.01(e)'s "best efforts" clause, "Blue Bell's business" is the object of the verb "conduct," and that verb is modified by the adverbial phrase "in accordance with sound business practices in the industry." It follows, then, that the relevant "industry" is the industry in which Blue Bell does business—namely, the dairy industry. *See* Compl. ¶ 2 ("Blue Bell is an ice cream manufacturer based in Brenham, Texas.").

[91] *See Lorillard Tobacco*, 903 A.2d at 738; *USA Cable v. World Wrestling Fed'n Entm't, Inc.*, 766 A.2d 462, 474 (Del. 2000) (An undefined term "with no 'gloss' in the [relevant] industry . . . should be [interpreted] in accordance with its ordinary dictionary meaning.").

[92] *Best Efforts*, BLACK'S LAW DICTIONARY (10th ed. 2014).

25

accepted views."[93]   In light of these dictionary definitions, I am satisfied that LPA § 6.01(e)'s plain meaning is that BB GP must endeavor diligently to conduct Blue Bell's business in accordance with practices that (1) are based on thorough knowledge of and experience with the dairy industry; or (2) agree with accepted views within that industry.

With this interpretation in mind, the phrase "sound business practices in the industry" in LPA § 6.01(e) may reasonably be understood to encompass (1) food safety practices prescribed by federal and state statutes, regulations and guidance documents applicable to dairy industry participants; and (2) food safety practices recommended by recognized trade organizations within the dairy industry, including the DPC and the IDFA.  As explained below, each of these sources offers readily available guidance regarding "sound business practices" in the dairy industry.

In the first instance, common sense suggests that "sound business practices" in a given industry require compliance with statutes, regulations, etc. applicable to businesses in that industry.  After all, a business that operates (or is operated) without regard for applicable laws, regulations and agency guidance risks being sued, fined or otherwise sanctioned into oblivion—and out of business.  It follows, then, that the

---

[93] *Sound*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (11th ed. 2009); *see USA Cable*, 766 A.2d at 474 (using MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY to define "regularly").

phrase "sound business practices in the industry" in LPA § 6.01(e) may reasonably be understood to encompass food safety practices prescribed by statutes, regulations and agency guidelines applicable to dairy product manufacturers such as Blue Bell.

That phrase may also reasonably be understood to encompass food safety practices recommended in DPC and IDFA guidelines. The DPC's membership comprises "[academic], dairy industry and regulatory personnel," and its food safety guidelines are "widely followed" in the dairy industry.[94] And the IDFA's members "represent more than 85% of the ice cream, frozen desserts, milk, cultured products, and cheese products produced and marketed in the U.S. . . ."[95] It is reasonable to infer, therefore, that the food safety recommendations in DPC and IDFA guidelines reflect thorough knowledge of (and experience with) dairy industry food safety issues as expressed by leaders in that industry.

In light of the foregoing, Plaintiffs' interpretation of the phrase "sound business practices in the industry" in LPA § 6.01(e) is reasonable. That is, the phrase may reasonably be understood to encompass the food safety practices prescribed by the statutes, regulations and guidelines referenced in the Complaint. This interpretation is consistent with the plain meaning of the phrase's constituent words,

---

[94] Compl. ¶ 29.

[95] Compl. ¶ 33.

27

as well as the syntax of the clause in which the phrase appears. And, based on this interpretation of LPA § 6.01(e), one may reasonably infer that "sound business practices in the [dairy] industry" require BB GP to "control[] or eliminat[e] condensation in the plant environment, properly clean[] and sanitize[] plant surfaces, adequately test[] for contamina[nts] such as Listeria . . . and determine[] and correct[] the[] cause [of bacterial contamination] if discovered."[96]

Insofar as the phrase "sound business practices in the industry" in LPA § 6.01(e) might be susceptible of some other reasonable interpretation, Defendants have not articulated one and the Court cannot discern one.[97] Instead,

---

[96] Compl., p. 14. To be sure, the content of "sound business practices in the [dairy] industry" presents a question of fact. LPA § 6.01(e); *cf. Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund, II, L.P.*, 624 A.2d 1199, 1206 (Del. 1993) ("Reasonableness is a question of fact to be determined by the finder of fact."). The plain meaning of the phrase "sound business practices in the industry" in LPA § 6.01(e), however, controls the parameters of that factual inquiry—and so delineates how the underlying question may (or must) be answered. *See Lorillard Tobacco*, 903 A.2d at 739 (Judicial interpretation of contractual language is "constrained by a combination of the parties' words and the plain meaning of those words where no special meaning is intended."); *Allied Capital*, 910 A.2d at 1030 (The "evident meaning" of clear contractual language should be given "binding effect."). Based on Plaintiffs' reasonable interpretation of LPA § 6.01(e)'s "best efforts" clause, and the Complaint's well-pled allegations, one may reasonably infer that "sound business practices in the [dairy] industry" require "controlling or eliminating condensation in the plant environment, properly cleaning and sanitizing plant surfaces, adequately testing for contamina[nts] such as Listeria . . . and determining and correcting the[] cause [of bacterial contamination] if discovered." Compl. ¶ 27.

[97] With that said, at this stage, I express no view regarding whether LPA § 6.01(e) is susceptible of other reasonable interpretations (and thus, ambiguous).

28

Defendants' approach here is to attack Plaintiffs' construction of LPA § 6.01(e) and then to argue that because the provision cannot mean what Plaintiffs say it means, they have failed to state a claim for breach of the LPA as a matter of law. Specifically, Defendants argue that:

- LPA § 6.01(e) "does not provide any guidance as to . . . what constitutes 'sound business practices in the industry,'"[98] such that BB GP has "no way to determine what industry standards it is bound by"[99]; and

- "[t]he absence of such guidance in [LPA § 6.01(e)] renders Plaintiffs' interpretation [of that provision] impossible to enforce and therefore unreasonable."[100]

As discussed above, the plain meaning of LPA § 6.01(e)'s operative language supports an inference that "sound business practices in the [dairy] industry"[101] include (1) food safety practices prescribed by federal laws, regulations and guidelines applicable to dairy product manufacturers such as Blue Bell; and (2) food safety practices recommended in DPC and IDFA guidelines. It cannot be said, therefore, that LPA § 6.01(e) provides no guidance as to "what constitute[] 'sound business practices in the [dairy] industry.'"[102]

---

[98] DOB at 32.

[99] *Id.*

[100] *Id.*

[101] LPA § 6.01(e).

[102] DOB at 32 (quoting LPA § 6.01(e)).

29

Nor can it be said that BB GP has *no* way to determine what industry standards it is bound to follow.  BB GP can readily consult statutes, regulations and agency guidance documents, along with DPC and IDFA food safety guidelines, just as Plaintiffs have done here.  And while it is possible that BB GP, despite its best efforts, might overlook one or more relevant statutes, regulations or guidelines, the extent to which such an omission would be consistent with best efforts is a question of fact.  At this juncture, Plaintiffs have pled sufficient facts from which it can reasonably be inferred that BB GP failed to use its best efforts as required by LPA § 6.01(e).

Defendants' argument that LPA § 6.11(d)'s contractual "good faith" standard negates (or "modifies") BB GP's "best efforts" obligation under LPA § 6.01(e) is untenable as a matter of law.  To be sure, "the Delaware Revised Uniform Limited Partnership Act ['DRULPA'] gives 'maximum effect to the principle of freedom of contract . . . . '"[103]  Accordingly, DRULPA provides that a Delaware limited partnership may within its limited partnership agreement "expand, restrict, or eliminate any fiduciary duties that a partner or other person might otherwise owe"

---

[103] *Norton*, 67 A.3d at 360 (quoting 6 *Del. C.* § 17–1101(c)).

to the limited partnership or another partner.[104]  And Blue Bell's LPA does just that

in LPA § 6.11(d), which provides:

> [a]ny standard of care and duty imposed by this Agreement or under [DRULPA] or any applicable law, rule or regulation shall be modified, waived or limited, to the extent permitted by law, as required to permit [BB GP] to act under this Agreement or any other agreement contemplated by this Agreement and to make any decision under the authority prescribed in this Agreement, so long as the action is reasonably believed by [BB GP] to be in, or not inconsistent with, [Blue Bell's] best interests."[105]

Our Supreme Court has confirmed that language such as appears in

LPA § 6.11(d) "unconditionally eliminate[s] all common law standards of care and

fiduciary duties, and substitute[s] a contractual good faith standard of care."[106]  This

contractual good faith standard, however, only "operates in the spaces of the LPA

---

[104] *Id.* (citing 6 *Del. C.* § 17–1101(d) ("To the extent that, at law or in equity, a partner or other person has duties (including fiduciary duties) to a limited partnership or to another partner or to another person that is a party to or is otherwise bound by a partnership agreement, the partner's or other person's duties may be expanded or restricted or eliminated by provisions in the partnership agreement.")).

[105] LPA § 6.11(d).

[106] *Brinckerhoff v. Enbridge Energy Co., Inc.*, 159 A.3d 242, 253 (Del. 2017) ("*Brinckerhoff V*").  In *Brinckerhoff V*, the operative contractual language read:

> Any standard of care and duty imposed by this Agreement or under [DRULPA or] any applicable law, rule or regulation shall be modified, waived or limited as required to permit the General Partner to act under this Agreement or any other agreement contemplated by this Agreement and to make any decision pursuant to the authority prescribed in this Agreement, so long as such action is reasonably believed by the General Partner to be in the best interests of the Partnership. *Id.*

31

without express standards."[107]  It does not displace or otherwise "modify" BB GP's affirmative contractual obligation under LPA § 6.01(e) to "use its best efforts to conduct [Blue Bell's] business . . . in accordance with sound business practices in the [dairy] industry."[108]  In other words, as relates to BB GP's obligation to conduct Blue Bell's business in accordance with sound business practices in the dairy industry, LPA § 6.01(e) fully occupies the space.  There is no room or need for LPA § 6.11(d) to modify BB GP's "best efforts" obligation under LPA § 6.01(e).[109]

### b.  Plaintiffs Have Well Pled that BB GP Breached LPA § 6.01(e)

Based on the Complaint's well-pled allegations, and the FDA inspection reports incorporated into the Complaint by reference, it is reasonably conceivable that BB GP failed to use its best efforts to operate Blue Bell's Texas and Oklahoma

---

[107] *Id.* at 254.

[108] LPA § 6.01(e).  *See Brinkerhoff V*, 159 A.3d at 254 (under "settled rules of contract interpretation, . . . the court [must] prefer specific provisions over more general ones."); *see also DCV Hldgs., Inc. v. ConAgra, Inc.*, 889 A.2d 954, 961 (Del. 2005) ("Specific language in a contract controls over general language, and where specific and general provisions conflict, the specific provision ordinarily qualifies the meaning of the general one.") (internal citations omitted).

[109] *See Brinkerhoff V*, 159 A.3d at 254–56 ("Even though Section 6.6(e) imposes an affirmative obligation on [the general partner], the Court of Chancery held that Section 6.10(d)'s contractual good faith standard 'modifies' Section 6.6(e), and requires [the limited partner plaintiff] to first show that [the general partner] lacked good faith in approving the transaction.  We are at a loss to understand how it does.  Section 6.6(e) imposes an affirmative obligation on [the general partner] when contracting with Affiliates.  Section 6.10(d), on the other hand, is a general standard of care that operates in the spaces of the LPA without express standards. . . . ") (footnotes omitted).

Plants "in accordance with sound business practices in the [dairy] industry," in breach of LPA § 6.01(e).[110]   *First*, the Complaint alleges, and FDA investigators observed, a multitude of food safety hazards at each facility in March and April 2015, including:

■     "[f]ailure to manufacture and package foods under conditions and controls necessary to minimize the potential for growth of microorganisms," such that certain ice cream products manufactured at those facilities prior to April 2015 were contaminated by *Listeria monocytogenes*[111];

■     inadequate "procedure[s] . . . for cleaning and sanitizing of [plant] equipment," as evidenced, in part, by recurring *Listeria* contamination in each facility[112]; and

■     "[t]he plant[s] [were] not constructed in such a manner as to prevent condensate from contaminating food and food-contact surfaces," such that condensate dripped directly into ice cream products.[113]

---

[110] LPA § 6.01(e).

[111] Compl. ¶ 38; *see* FDA Observations (Texas Plant) at 1 (identifying three lots of Blue Bell ice cream products manufactured at the Texas Plant between August 2014 and March 2015 that were contaminated by *Listeria monocytogenes*); FDA Observations (Oklahoma Plant) at 1 (identifying three lots of Blue Bell ice cream products manufactured at the Oklahoma Plant between April 2014 and March 2015 that were contaminated by *Listeria monocytogenes*).

[112] Compl. ¶ 38; *see* FDA Observations (Texas Plant) at 2 (discussing Blue Bell's failure to control recurring *Listeria* contamination at the Texas Plant in February and March 2015); FDA Observations (Oklahoma Plant) at 3–4 (stating that "[Blue Bell] failed to demonstrate [its] cleaning and sanitizing program [was] effective in controlling recurring microbiological contamination [in the Oklahoma Plant]" and identifying sixteen instances of *Listeria* contamination in the Oklahoma Plant from March 2013 to January 2015).

[113] Compl. ¶ 38; FDA Observations (Texas Plant) at 2–3 (stating that FDA investigators inspecting the Texas Plant in March and April 2015 "observed condensate and drip throughout the facility" and reporting four separate instances of "condensate . . . dripping directly into ice cream products"); FDA Observations (Oklahoma Plant) at 6–

33

*Second*, the Complaint alleges that, despite Blue Bell's discovery of "*Listeria* [bacteria] in [its Oklahoma Plant] on at least 5 separate occasions in 2013 and on 10 more occasions in 2014," Blue Bell "never conducted . . . [a] root cause analysis to determine the source of the [*Listeria* bacteria], did not increase the frequency or scope of its *Listeria* testing protocol, did not disassemble any equipment, and did not take any effective action to [mitigate] the continuing and growing *Listeria* threat, much less eradicate it."[114]  These failures, according to the Complaint, led directly to the discovery of *Listeria* in Blue Bell ice cream products by government health inspectors.[115]

Based on these factual allegations, and the FDA observations referenced in the Complaint, one may reasonably infer that BB GP failed to use its best efforts to operate Blue Bell's Texas and Oklahoma Plants in accordance with "sound business practices in the [dairy] industry,"[116] per Plaintiffs' reasonable interpretation of that

---

7 (reporting that FDA investigators inspecting the Oklahoma Plant in March 2015 observed similar condensation issues).

[114] Compl. ¶ 42.

[115] Compl. ¶ 43.

[116] LPA § 6.01(e).  The relevant "industry standards" are discussed at length above, and include: (1) food safety practices prescribed by the FDA regulations codified at 21 C.F.R. Parts 110 and 117; and (2) food safety practices recommended in the IDFA's 2002 HACCP plant manual and in DPC 8, DPC 56, DPC 60 and DPC 61.

phrase.  That being so, the Complaint adequately pleads that BB GP breached an obligation owed to Blue Bell under LPA § 6.01(e).

### c. Plaintiffs Have Well Pled Resulting Damages to Blue Bell

Finally, the Complaint well pleads that Blue Bell was damaged by BB GP's (alleged) breach of LPA § 6.01(e).  Specifically, the Complaint alleges that "Blue Bell lost a substantial portion of its value . . . [and was] forced to pay personal injury settlements, fines and penalties" as a result of that breach.[117]  These allegations more than satisfy Delaware's notice pleading standard.[118]

### d. Count I is Properly Characterized as a Breach of Contract Claim

Before leaving Count I, it is appropriate to clarify precisely what is pled there, as such clarification will be useful when the parties take discovery, engage in further motion practice or possibly try the claim.  The Complaint styles Count I as a claim for "breach of contractual fiduciary duties."[119]  A "contractual fiduciary duty" is a fiduciary duty (1) the scope of which is established by contract; *or* (2) compliance

---

[117] Compl. ¶ 63.

[118] *See Savor*, 812 A.2d at 896–97 ("[E]ven vague allegations are "well-pleaded" if they give the opposing party notice of the claim."); *Anglo Am. Sec. Fund, L.P. v. S.R. Global Int'l Fund, L.P.,* 829 A.2d 143, 156 (Del. Ch. 2003) ("Proof of [alleged] damages and of their certainty need not be offered in the complaint in order to state a claim [for breach of contract].").  I note that the LPA contains two exculpatory provisions (in LPA §§ 6.01(e) and 6.08).  I address these two provisions in the demand excusal analysis.

[119] Compl., p. 34.

with which is measured by a contractual standard.[120]  When a limited partnership agreement eliminates the general partner's common law fiduciary duties to the entity and its limited partners, however, the general partner cannot—and does not—owe contractual fiduciary duties to such parties.[121]

Here, LPA § 6.11(d) "unconditionally eliminate[s] all common law standards of care and fiduciary duties" owed by BB GP.[122]  Thus, BB GP's performance obligation under LPA § 6.01(e) is *not* a "contractual fiduciary duty"; it is a purely contractual duty.[123]  Accordingly, Count I is properly characterized as a breach of contract claim, rather than a claim for breach of contractual fiduciary duties.

## 2. Count II – Veil Piercing, Agency or Joint Venture Liability

Count II of the Complaint charges that BB USA and the Individual Defendants caused BB GP to breach LPA § 6.01(e) and "are[,] [therefore,] jointly and severally liable for [that] breach[]"[124] for the following reasons:

---

[120] *See Allen v. El Paso Pipeline GP Co., L.L.C.*, 2014 WL 2819005, at *19 (Del. Ch. June 20, 2014).

[121] *See id.*; *see also Brinkerhoff V*, 159 A.3d at 252–53 ("DRULPA permits the LPA drafter to disclaim fiduciary duties, and replace them with contractual duties.").

[122] *Brinkerhoff V*, 159 A.3d at 253.

[123] *See id.* at 252–53.

[124] Compl. ¶ 67.

■ BB USA and the Individual Defendants exercised "complete dominion and control over BB GP" at all relevant times, such that the Court should disregard BB GP's separate legal existence for liability purposes.[125]

■ BB USA "acted as principal in an agency relationship with BB GP to operate and manage Blue Bell."[126]

■ "Alternatively, BB USA and BB GP acted together in a joint venture to operate and manage Blue Bell."[127]

As explained below, Count II fails to state a claim because (1) the Complaint's well-pled allegations do not suggest that piercing BB GP's corporate veil is warranted; and (2) Delaware law does not recognize a theory whereby the beneficiary of a contractual covenant can be liable for breach of contract by "causing" the promisor to breach that covenant.[128]

### a. Plaintiffs Have Not Pled a Basis for Veil-Piercing

While they stop short of saying the words, Plaintiffs' allegation that BB USA and the Individual Defendants exercised "complete dominion and control over

---

[125] *Id.*

[126] *Id.*

[127] *Id.*

[128] *See Gerber v. EPE Hldgs., LLC*, 2013 WL 209658, at *11 (Del. Ch. Jan. 18, 2013) ("Delaware law does not recognize a claim for aiding and abetting a breach of contract."); *cf. NACCO Indus., Inc. v. Applica Inc.,* 997 A.2d 1, 35 (Del. Ch. 2009) ("A breach of contract is not an underlying wrong that can give rise to a civil conspiracy claim."). The Court notes that Count II does *not* allege (or even suggest) that BB USA or the Individual Defendants tortiously interfered with BB GP's performance of its contractual obligation under LPA § 6.01(e). Accordingly, this Memorandum Opinion expresses no view as to whether a derivative tortious interference claim against BB USA or the Individual Defendants (or both) might have been viable.

BB GP" suggests that Plaintiffs are seeking to pierce the corporate veil of BB GP.[129]

Under Delaware law, "[p]iercing the corporate veil under the alter ego theory 'requires that the corporate structure cause fraud or similar injustice.'"[130] "Effectively, the corporation must be a sham and exist for no other purpose than as a vehicle for fraud."[131] The allegations in this Complaint fall far short of striking that mark. The Complaint does not allege—or even suggest—that BB GP exists solely as a vehicle for fraud. Accordingly, Plaintiffs' veil-piercing theory of liability fails as a matter of law.

### b. Plaintiffs Have Not Pled Agency Liability

Plaintiffs' attempt to hold BB USA liable for BB GP's alleged breach of the LPA based on an agency theory fails because Delaware law recognizes no theory under which a principal can be vicariously liable for its agent's non-tortious breach of contract.[132] Here, while Plaintiffs allege that BB USA "acted as principal in an

---

[129] *See Wallace ex rel. Cencom Cable Income P'rs II, Inc., L.P. v. Wood*, 752 A.2d 1175, 1184 (Del. Ch. 1999) ("The degree of control required to pierce the veil [of a corporate general partner] is 'exclusive domination and control . . . to the point that [the General Partner] no longer ha[s] legal or independent significance of [its] own.'") (quoting *Hart Hldg. Co. Inc. v. Drexel Burnham Lambert Inc.*, 1992 WL 127567, at *11 (Del. Ch. May 28, 1992)).

[130] *Cencom Cable*, 752 A.2d at 1184 (quoting *Outokumpu Eng'g Enter., Inc. v. Kvaerner Enviropower, Inc.*, 685 A.2d 724, 729 (Del. 1996)).

[131] *Id.*

[132] The Complaint fails to plead any facts that would allow an inference that BB USA authorized BB GP to enter into the LPA on its behalf much less to commit BB USA to manage Blue Bell in accordance with a specified standard of conduct.

38

agency relationship with BB GP to operate and manage Blue Bell,"[133] they do not

contend that BB GP's (alleged) breach of LPA § 6.01(e) was tortious vis-à-vis Blue

Bell. Thus, Plaintiffs' agency law theory of BB USA's liability fails as a matter of

law.

*See* RESTATEMENT (THIRD) OF AGENCY § 6.05 (2006) (recognizing that principal cannot be held liable for agent's breach of contract when principal did not authorize agent to contract on its behalf). Moreover, there is no basis in our law to hold BB USA vicariously liable for BB GP's breach of contract. *Cf. NACCO*, 997 A.2d at 35 ("A breach of contract is not an underlying wrong that can give rise to a civil conspiracy claim."); *Kuroda v. SPJS Hldgs., L.L.C.*, 971 A.2d 872, 892 (Del. Ch. 2009) ("[U]nless the breach also constitutes an independent tort, a breach of contract cannot constitute an underlying wrong on which a claim for civil conspiracy could be based[.]"). In Delaware, "[c]ivil conspiracy [liability] is vicarious liability" premised upon agency law. *Albert v. Alex. Brown Mgmt. Servs., Inc.*, 2005 WL 2130607, at *11 (Del. Ch. Aug. 26, 2005); *see also Parfi Hldg. AB v. Mirror Image Internet, Inc.*, 794 A.2d 1211, 1238 (Del. Ch. 2001) ("Civil conspiracy . . . provides a mechanism to impute liability to those not a direct party to the underlying [wrong]."). Thus, under Delaware law, "a conspirator is jointly and severally liable for the acts of co-conspirators . . . in furtherance of the conspiracy," *Nicolet, Inc. v. Nutt*, 525 A.2d 146, 150 (Del. 1987), on the rationale that co-conspirators are properly "considered agents of each other when acting in furtherance of th[eir] [common unlawful objective]." *In re Am. Int'l Gp., Inc.*, 965 A.2d 763, 815 (Del. Ch. 2009), *aff'd sub nom. Teachers' Ret. Sys. of Louisiana v. PricewaterhouseCoopers LLP*, 11 A.3d 228 (Del. 2011). With these principles in mind, the clear implication of the *NACCO* and *Kuroda* decisions is that Delaware law recognizes no theory of vicarious liability for a non-tortious breach of contract. That is, if "[c]ivil conspiracy [liability] is vicarious liability," *Albert*, 2005 WL 2130607, at *11, and a non-tortious "breach of contract . . . can[not] give rise to a civil conspiracy claim," *NACCO*, 997 A.2d at 35; *Kuroda*, 971 A.2d at 892, it follows that a non-tortious breach of contract cannot give rise to vicarious liability.

[133] Compl. ¶ 67. The Court's analysis here assumes, without deciding, that an agency relationship exists between BB GP and BB USA.

### c. Plaintiffs Have Not Pled Joint Venture Liability

Finally, Plaintiffs' claim that BB USA is liable as BB GP's joint venturer is preempted by the LPA, which governs all aspects of BB USA and BB GP's relationship with respect to Blue Bell. Under Delaware law, a joint venture is created where there is:

> (1) a community of interest in the performance of a common purpose; (2) joint control or right of control; (3) a joint proprietary interest in the subject matter; (4) a right to share in the profits; and (5) a duty to share in the losses which may be sustained.[134]

Here, BB GP and BB USA are bound together by contract, *i.e.*, by the LPA.[135] And, as made clear in the LPA, BB GP is vested with the exclusive authority to manage Blue Bell's business and affairs.[136] Thus, the LPA itself reveals that BB GP

---

[134] *Sunrise Ventures, LLC v. Rehoboth Canal Ventures, LLC*, 2010 WL 975581, at \*2 (Del. Ch. Mar. 4, 2010) (internal quotation and citation omitted). While a joint venture requires "some sort of contractual relationship between the parties, [the existence of such a relationship] may be implied or proven by facts and circumstances showing that such an enterprise was in fact entered into." *J. Leo Johnson, Inc. v. Carmer*, 156 A.2d 499, 502 (Del. 1959).

[135] *See Norton*, 67 A.3d at 360 ("Limited partnership agreements are a type of contract."); 6 *Del. C.* § 17–101(12) ("A partner of a limited partnership . . . is bound by the partnership agreement whether or not the partner . . . executes the partnership agreement.").

[136] LPA §§ 6.01(a) ("[BB GP] shall have the exclusive right and full authority to manage, conduct, control and operate [Blue Bell's] business"), 6.10 ("No Limited Partner . . . may take part in the management . . . of [Blue Bell's] business and affairs.").

and BB USA, in fact, did *not* intend to "act[] together in a joint venture to operate and manage Blue Bell."[137]

Given the LPA's clear terms with respect to BB GP's management function, Plaintiffs are left to argue that the conduct of BB USA and BB GP, respectively, somehow amended the LPA to (1) divest BB GP of the exclusive authority to manage Blue Bell's business and affairs; and (2) instead repose that authority in BB GP and BB USA jointly. The Complaint's well-pled factual allegations, however, do not permit a reasonable inference that such an amendment ever took place.[138] Accordingly, Plaintiffs' joint venture theory of BB USA's liability fails as matter of law.

### 3. Count III - "Aiding and Abetting"

Count III charges that BB USA and the Individual Defendants aided and abetted BB GP's (alleged) breach of LPA § 6.01(e). Because BB GP's performance obligation under LPA § 6.01(e) is purely contractual in nature, the claim advanced in Count III is, in substance, a claim for aiding and abetting a breach of contract. Delaware law, however, "does not recognize a claim for aiding and abetting a breach

---

[137] Compl. ¶ 67.

[138] Moreover, under LPA § 16.02, the LPA could not have been amended without a writing evidencing the amendment.

41

of contract."[139]  Consequently, Count III fails to state a claim upon which relief may be granted and must be dismissed.

### 4. Count IV - Breach of Fiduciary Duty

Count IV alleges that BB USA and the Individual Defendants owed common law fiduciary duties to Blue Bell and breached those duties by failing to "exercise due care and loyalty in connection with the operation of Blue Bell's facilities."[140] The claim advanced in Count IV is premised on the rule established in *In re USACafes, L.P. Litigation*,[141] under which a corporate general partner's fiduciary duties to the limited partnership may extend to the general partner's controllers, if such persons exercise control over the limited partnership's property.[142] The *USACafes* rule, however, has limited—if any—application where, as here, the limited partnership agreement entirely eliminates the general partner's common law fiduciary duties to the limited partnership and its limited partners.  In such a case,

---

[139] *Gerber*, 2013 WL 209658, at *11 (citing *Zimmerman v. Crothall*, 2012 WL 707238, at *19 (Del. Ch. Mar. 12, 2012)).

[140] Compl. ¶ 80.

[141] 600 A.2d 43 (Del. Ch. 1991).

[142] *See id.* at 48–49 ("I understand the principle of fiduciary duty, stated most generally, to be that one who controls property of another may not, without . . . agreement, intentionally use that property in a way that benefits the [controller] to the detriment of the property or its beneficial owner. . . .  The theory underlying fiduciary duties is consistent with recognition that a director of a corporate general partner bears . . . a duty [of loyalty] towards the limited partnership.  That duty, of course, extends only to dealings with the partnership's property or affecting its business . . . .").

the corporate general partner owes no fiduciary duties that may be "extended" to its controllers.[143] Thus, where the limited partnership agreement entirely eliminates the general partner's common law fiduciary duties, it is highly doubtful that the general partner's controllers owe *any* fiduciary duties to the limited partnership. Insofar as they do, however, those duties require only that the controllers refrain from self-dealing; *i.e.*, that they "not . . . use control over the [limited] partnership's property to advantage [themselves] at the expense of the partnership."[144]

Here, because LPA § 6.11(d) "unconditionally eliminate[s] all common law . . . fiduciary duties" owed by BB GP,[145] I am satisfied that neither BB USA nor the Individual Defendants owe any fiduciary duties directly to Blue Bell (or its limited partners)—even if they exercise control over Blue Bell's property. Assuming, *arguendo*, that they do owe such duties, however, those duties require only that BB USA and the Individual Defendants not engage in self-dealing with

---

[143] *See Brinkerhoff V*, 159 A.3d at 252–53 ("DRULPA permits the LPA drafter to disclaim fiduciary duties, and replace them with contractual duties. If fiduciary duties have been validly disclaimed, the limited partners cannot rely on traditional fiduciary principles to regulate the general partner's conduct.") (footnotes omitted).

[144] *USACafes*, 600 A.2d at 49; *see also Feeley*, 62 A.3d at 671–72 (expressly declining to extend *USACafes* to duty of care claims); *Bay Ctr. Apts. Owner, LLC v. Emery Bay PKI, LLC*, 2009 WL 1124451, at *10 (Del. Ch. Apr. 20, 2009) ("In practice, the cases applying *USACafes* have not ventured beyond the clear application stated in *USACafes*: 'the duty not to use control over the partnership's property to advantage the corporate director at the expense of the partnership.'") (quoting *USACafes*, 600 A.2d at 49).

[145] *Brinkerhoff V*, 159 A.3d at 253.

respect to Blue Bell.[146]  Yet the Complaint does not well plead that BB USA or any of the Individual Defendants "use[d] control over [Blue Bell's] property to advantage [themselves] at the expense of [Blue Bell]."[147]  Nor do the Complaint's well-pled factual allegations permit a reasonable inference to that effect. Consequently, it is not reasonably conceivable that Count IV states a claim upon which relief may be granted.

## B. Whether Demand is Excused as to Count I of the Complaint

"Before limited partners may bring a derivative claim in [t]he Court of Chancery, Delaware law requires the[m] . . . to make a demand on the general partner to bring the action or explain why they made no demand."[148]  If no pre-suit demand is made, the derivative complaint must allege particularized facts establishing that such a demand would have been futile and is therefore excused.[149]  Plaintiffs did not

---

[146] *See USACafes*, 600 A.2d at 49.

[147] *Id.*

[148] *Seaford Funding Ltd. P'ship v. M & M Assocs. II, L.P.*, 672 A.2d 66, 69 (Del. Ch. 1995) (citing 6 *Del. C.* § 17–1001 and *Litman v. Prudential–Bache Props., Inc.*, 611 A.2d 12, 17 (Del. Ch. 1992) ("*Litman I*")).

[149] *See* 6 *Del. C.* § 17–1003 ("In a derivative action, the complaint shall set forth with particularity the effort, if any, of the plaintiff to secure initiation of the action by a general partner or the reasons for not making the effort."); *Forsythe v. ESC Fund Mgmt. Co. (U.S.)*, 2007 WL 2982247, at *5 (Del. Ch. Oct. 9, 2007) ("Delaware courts look to pleading standards developed in the corporate context to determine whether a limited partner has alleged particularized facts satisfying [Section 17–1003's] requirements."); *Litman v. Prudential-Bache Props., Inc.*, 1993 WL 5922, at *2–3 (Del. Ch. Jan. 4, 1993) ("*Litman II*").

make any pre-suit demand on Blue Bell's general partner, BB GP. Thus, the Court must determine whether the Complaint's particularized factual allegations establish that such a demand would have been futile and is therefore excused. Because Count I is the only count of the Complaint that states a viable claim, the Court's demand excusal analysis focuses on Count I.

### 1. The Test for Demand Excusal

"[C]orporate standards apply to limited partnerships in the 'demand excused' analysis," and "[d]emand futility issues in the partnership context are the same as in the corporate context."[150] Thus, where a limited partner sues a general partner derivatively "because [the general partner] failed to do something,"[151] the test for demand excusal is "whether or not the particularized factual allegations of [the] derivative . . . complaint create a reasonable doubt that, as of the time the complaint is filed, the [general partner] could have properly exercised its independent and disinterested business judgment in responding to a demand."[152] A general partner

---

[150] *Seaford Funding*, 672 A.2d at 70 (citing *Litman II*, 1993 WL 5922, at *2–3).

[151] *Rales v. Blasband*, 634 A.2d 927, 934 n.9 (Del. 1993).

[152] *Id.* at 934; *Forsythe*, 2007 WL 2982247, at *5 (Where the complaint challenges a failure to act when action is "necessary," "the [*Rales*] test will be applied in the context of a demand on the general partner of a limited partnership."). Plaintiffs argue that *Rales* is not the appropriate test for demand excusal because the Complaint "alleges specific actions [not identified] that failed to conform to the LPA's best efforts" covenant. Pls.' Answering Br. in Opp'n to Defs.' Mot. to Dismiss ("Pls.' Ans. Br.") at 56 n.29. I disagree. Count I is a classic oversight claim packaged as a breach of contract. Reduced to its essence, Count I alleges that BB GP failed to act in accordance with its

has "a disabling interest for pre-suit demand purposes" when it faces a "substantial likelihood" of liability in connection with the derivative claim(s) asserted against it.[153] And, in the case of a corporate general partner, the demand excusal inquiry focuses on the general partner itself (as an entity), rather than on its board of directors.[154]

### 2. BB GP Faces a Substantial Likelihood of Liability for Breach of LPA § 6.01(e)

After carefully reviewing the Complaint, I am satisfied that its particularized factual allegations regarding food safety hazards at Blue Bell's Texas and Oklahoma Plants prior to the 2015 product recall satisfy the "substantial likelihood" of liability standard as to Count I, such that BB GP has "a disabling interest for pre-suit demand purposes . . . ."[155] Those particularized factual allegations thus "create a reasonable doubt that, as of the time the [C]omplaint [was] filed, [BB GP] could have properly

---

management obligations to oversee plant operations as imposed by LPA § 6.01(e). This type of claim implicates the *Rales* paradigm. *See In re Goldman Sachs Gp., Inc. S'holder Litig.*, 2011 WL 4826104, at *18 (Del. Ch. Oct. 12, 2011) (holding that "*Rales* standard applies" to claims that board failed to monitor operations).

[153] *Ryan v. Gifford*, 918 A.2d 341, 355 (Del. Ch. 2007) (quoting *In re Baxter Int'l, Inc. S'holders Litig.*, 654 A.2d 1268, 1269 (Del. Ch. 1995)).

[154] *See, e.g.*, *Gotham v. Hallwood Realty P'rs, L.P.*, 1998 WL 832631, at *5 (Del. Ch. Nov. 10, 1998) ("I hold that [the limited partner plaintiff] must plead the futility of presuit demand [on] . . . the corporation acting as general partner.").

[155] *Ryan*, 918 A.2d at 355.

exercised its independent and disinterested business judgment in responding to a demand" respecting Count I.[156]

In brief review, the plain meaning of the phrase "sound business practices in the [dairy] industry" in LPA § 6.01(e) includes food safety practices that (1) are "based on thorough knowledge [of] and experience [with]" dairy industry matters; or (2) "agree[] with accepted views" on food safety in the dairy industry.[157] Accordingly, that phrase may reasonably be understood to incorporate the food safety practices prescribed by the laws, regulations and guidelines cited in the Complaint.

With this interpretation in mind, one may reasonably infer that LPA § 6.01(e) obligates BB GP to use its best efforts to:

■    "control[] or eliminat[e] condensation" in Blue Bell's production plants[158];

■    "properly clean[] and sanitiz[e] plant surfaces"[159];

■    "adequately test[] for contamina[nts] such as Listeria" in Blue Bell's food products and production plants[160]; and

---

[156] *Rales*, 634 A.2d at 934.

[157] *Sound*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY.

[158] Compl., p. 14.

[159] *Id.*

[160] *Id.*

47

■ "determin[e] and correct[] the[] cause [of bacterial contamination] if discovered."[161]

The Complaint's particularized factual allegations regarding *Listeria* contamination and other food safety hazards at Blue Bell's Texas and Oklahoma Plants prior to the 2015 product recall are sufficient to establish a "substantial likelihood" for demand excusal purposes that BB GP failed to discharge its "best efforts" obligation under LPA § 6.01(e) in connection with its operation of those facilities.

### 3. The LPA's Exculpatory Provisions Do Not Alter the Demand Futility Analysis

In cases where a limited partnership agreement exempts the general partner from liability under certain circumstances, "the risk of liability does not disable [the general partner] from considering a demand fairly unless particularized pleading permits the court to conclude that there is a substantial likelihood that [the general partner's] conduct falls outside the exemption."[162] Here, the LPA contains two exculpatory provisions—in LPA § 6.01(e) and LPA § 6.08. As explained below, however, these provisions do not unambiguously exculpate BB GP's alleged breach

---

[161] *Id.*

[162] *Baxter*, 654 A.2d at 1270; *cf. In re Synthes, Inc. S'holder Litig.*, 50 A.3d 1022, 1032 (Del. Ch. 2012) ("Because the directors on the Board are protected by the § 102(b)(7) provision exculpating them for personal liability stemming from a breach of the duty of care, the complaint must be dismissed against the directors unless the plaintiffs have successfully pled non-exculpated claims for breach of the duty of loyalty against them.").

of LPA § 6.01(e)'s "best efforts" clause. They cannot provide, therefore, a basis for overcoming otherwise properly pled allegations supporting demand futility with respect to Count I.[163]

Section 6.01(e)'s exculpatory clause provides, in pertinent part, that:

[BB GP] shall not be liable or responsible to any Partner or [to Blue Bell] for any losses sustained or liabilities incurred in connection with or attributable to errors in judgment of [BB GP], *excluding those that are attributable to* [BB GP's] . . . *breach of any material provision of this Agreement . . . .* [164]

The "best efforts" covenant in Section 6.01(e) is clearly a "material provision" of the LPA; it addresses how BB GP shall manage Blue Bell's business.[165] BB GP's

---

[163] I note that Defendants have not invoked these exculpatory provisions expressly as a basis to defeat Plaintiffs' demand futility pleading. By failing to raise these provisions, Defendants have waived any arguments or defenses based on them. *See Emerald P'rs v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999) (issues not briefed are deemed waived). I address them, nevertheless, for the sake of completeness.

[164] LPA § 6.01(e) (emphasis supplied).

[165] "What [contract] terms are material is determined on a case-by-case basis, depending on the subject matter of the agreement and on the contemporaneous evidence of what terms the parties considered essential." *Eagle Force Hldgs., LLC v. Campbell*, 2018 WL 2351326, at *16 (Del. May 24, 2018). Here, the LPA's purpose is to spell out the organization and governance of Blue Bell; thus, the LPA addresses, among other things, how Blue Bell shall be managed—and how management shall operate the Company's business. In this connection, LPA § 6.01(a) vests BB GP with the "exclusive right and full authority to manage, conduct, control and operate [Blue Bell's] business," and LPA § 6.01(e)'s "best efforts" covenant prescribes, in part, how BB GP shall conduct Blue Bell's business. Both provisions, therefore, are essential (or material) to the LPA's overall design. Moreover, LPA § 6.01(e)'s bespoke character indicates that the parties to the LPA considered that particular provision to be a key component of Blue Bell's governance scheme.

breach of that covenant, therefore, is not exculpated under Section 6.01(e)'s exculpatory clause.

The second potentially applicable exculpatory clause, LPA § 6.08, provides that:

> [n]o Indemnitee [including BB GP] shall be liable to [Blue Bell] or to the Partners for any losses sustained or liabilities incurred as a result of any act or omission of such Indemnitee, if: (a) the act or omission is specifically authorized under this Agreement or the [DRULPA], or (b) the conduct of the Indemnitee did not constitute actual fraud, gross negligence, willful misconduct or a breach of fiduciary duty to [Blue Bell] or the Partners ***and*** if the Indemnitee acted in good faith and in a manner it believed to be in, or not opposed to, [Blue Bell's] best interest."[166]

By its terms, LPA § 6.08(a) does not exculpate acts or omissions that are not authorized by the LPA, *e.g.*, an omission by BB GP that constitutes a breach of LPA § 6.01(e)'s "best efforts" clause. And, unlike LPA § 6.08(a)'s express reference to "omissions," LPA § 6.08(b) does not appear to address omissions at all.[167] Rather, it appears that exculpation under LPA § 6.08(b) is available only where an Indemnitee (here, BB GP) has "*acted* in good faith."[168]

---

[166] LPA § 6.08 (emphasis supplied).

[167] *See, e.g.*, *EBG Hldgs. LLC v. Vredezicht's Gravenhage 109 B.V.*, 2008 WL 4057745, at *10 (Del. Ch. Sept. 2, 2008) ("[T]he parties to the Amended LLC Agreement, by expressly including Affiliates . . . within the ambit of [the agreement's] indemnification [provision] while referring only to parties in the jurisdiction provision, manifested an intent not to include Affiliates under [the indemnification provision.]").

[168] For their part, Plaintiffs argue that LPA § 6.08(b) does not apply because they have well-pled that Defendants acted with gross negligence and failed to act in good faith.

50

LPA § 6.08(b)'s second, conditional clause is joined to the provision's first clause by the conjunction "and," suggesting that the second clause states a separate requirement for exculpation under LPA § 6.08(b); namely, that the Indemnitee must have "acted in good faith and in a manner it believed to be in, or not opposed to, [Blue Bell's] best interest."[169]  Nonfeasance, or a thoughtless failure to act, would therefore not appear to be exculpable under LPA § 6.08(b).  After all, one cannot act in good faith if one does not think to act in the first instance.

At best for BB GP, a construction of LPA § 6.08(b) that encompasses omissions "may be reasonable, [but] it is certainly not the only reasonable interpretation."[170]  "Although it could have," the exculpatory clause does not expressly "eliminate or modify the ability of [limited partners] to bring a suit on behalf of the [limited partnership] or modify the prerequisites for bringing such a

---

Pls.' Ans. Br. 9–10.  While that may well be so, I need not reach those issues given that LPA § 6.08(b) does not appear to apply to Count I as pled in any event.

[169] LPA § 6.08(b); *see, e.g.*, *Thomas v. Mayor & Council of City of Wilmington*, 391 A.2d 203, 205 (Del. 1978) (Where "requirements [for exculpation] are stated in the conjunctive . . . both [requirements] must be shown before an [indemnitee] is entitled to [exculpation].").

[170] *Kahn v. Portnoy*, 2008 WL 5197164, at * 10 (Del. Ch. 2008) (holding that the invocation of a potentially ambiguous exculpatory provision within a limited liability company operating agreement was not sufficient to defeat otherwise well-pled allegations of demand futility).

51

suit."[171]  Accordingly, I cannot conclude that LPA § 6.08 operates to negate the Complaint's otherwise well-pled allegations of demand futility.

### III.  CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is DENIED as to Count I of the Complaint and GRANTED as to Counts II, III and IV, which are dismissed with prejudice under Chancery Rule 12(b)(6) for failure to state a claim.

**IT IS SO ORDERED.**

---

[171] *Id.* at * 11.